**Paul HAMMONTREE, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Consolidated Freightways Corporation of Delaware, Intervenor.**

No. 89–1137.

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Dec. 12, 1990.

Decided Feb. 12, 1991.

Paul Alan Levy, with whom Alan B. Morrison was on the brief, for petitioner. Arthur L. Fox, II, Washington, D.C., also entered an appearance for petitioner.

John H. Ferguson, Deputy Asst. Gen. Counsel, with whom Aileen A. Armstrong, Deputy Associate General Counsel, and Linda Sher, Asst. Gen. Counsel, N.L.R.B., were on the brief, for respondent. Joseph A. Oertel and Paul J. Spielberg, Attys., N.L.R.B., Washington, D.C., also entered appearances, for respondent.

David P. Jaqua, Memphis, Tenn., for intervenor.

Before MIKVA, Chief Judge, WALD, EDWARDS, RUTH BADER GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, THOMAS, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD, in which Circuit Judges RUTH BADER GINSBURG, SILBERMAN, BUCKLEY, STEPHEN F. WILLIAMS, D.H. GINSBURG, SENTELLE, CLARENCE THOMAS, HENDERSON, and RANDOLPH, concur.

Concurring opinion filed by Circuit Judge HARRY T. EDWARDS.

Concurring opinion filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Chief Judge MIKVA.

WALD, Circuit Judge:

Paul Hammontree challenges a National Labor Relations Board ("NLRB" or "Board") order that requires him to exhaust grievance remedies established by a collective bargaining agreement before the Board considers his unfair labor practice complaint. Hammontree contends that such an exhaustion requirement is both inconsistent with the Board's authority under the National Labor Relations Act ("NLRA") and the Labor Management Relations Act ("LMRA"), and a departure from the Board's past policy. We find that the NLRA and the LMRA permit the Board to require an individual employee to exhaust his grievance remedies prior to the filing of an unfair labor practice charge and that the Board's order was both reasonable and consistent with its established practices. Accordingly, we deny Hammontree's petition for review.

I. BACKGROUND

A. *Factual Background*

Hammontree is employed as a truck driver by intervenor Consolidated Freightways ("CF"); he drives "peddle" runs—short roundtrips of less than 200 miles.[1] In 1982, when CF first offered peddle runs out of its Memphis, Tennessee terminal, it established a "choice of runs" policy under which available runs were posted and drivers chose runs in order of seniority. Although under this system senior drivers could choose longer (and thus more lucrative) runs, no driver knew the departure time of his or her run; as a result, drivers often "babysat the telephone." Later that year, CF and Hammontree's union local reached an oral agreement: CF would post departure times for peddle runs, but would eliminate the seniority-based "choice of runs." As part of this *quid pro quo*, the union also agreed to withdraw any grievances that might be filed by drivers claiming choice of runs.

In February 1985, as the union's collective bargaining agreement ("CBA") with CF was expiring, Jimmy Carrington, the local's newly-elected president, wrote a letter to CF which stated that "any agreements [between the union and CF] become null and void [on] March 31, 1985." The new CBA, which became effective in April 1985, included a maintenance of standards

---

1. Throughout the dissent, Hammontree is characterized as a "dissident member of the union," Dissent ("Diss.") at 1505, and as "at odds with his union's leadership," *id.* at 1516. These characterizations, if true, are atmospherics only; the record contains absolutely no evidence of any hostility between Hammontree and the union in regard to this dispute. As discussed below, *infra* Part II. B. 1, this lack of hostility is indeed significant to our analysis.

provision[2] and required that any local standards not already included in the CBA be "reduce[d] to writing." The new contract failed to specify procedures for the assignment of peddle runs and the *quid pro quo* agreement exchanging departure times for seniority rights was not reduced to writing.

In late 1985, Hammontree filed a grievance ("Grievance 180") claiming that his seniority rights had been violated by peddle-run assignment practices. Pursuant to the CBA, Hammontree's grievance was heard by a "Multi–State Grievance Committee" composed of an equal number of union and management representatives. This committee failed to resolve the grievance, which Hammontree then pursued to the next level, the Southern Area Grievance Committee. That committee sustained Hammontree's claim and awarded him damages.

Thereafter, CF stopped posting run departure times. Hammontree then filed a second grievance ("Grievance 101") claiming, *inter alia*, that the removal of run times violated the maintenance of standards provision. The first-level grievance committee denied the claim. Hammontree then filed an unfair labor practice ("ULP") charge, and the NLRB's General Counsel issued a complaint, alleging that by removing departure times in response to Hammontree's exercise of his grievance rights (in Grievance 180) and by assigning Hammontree less desirable runs, CF had violated §§ 8(a)(1) and 8(a)(3) of the NLRA.[3]

Before the Administrative Law Judge ("ALJ"), CF maintained that the grievance committee had adequately considered Hammontree's discrimination complaint and that the Board should defer to the committee's decision and thus need not consider anew the § 8(a) allegations. In the alternative, CF contended, the Board should refer the claim to the grievance procedures established under the CBA,[4] because the contract, like § 8(a), bars discrimination against union members.[5] The ALJ ruled that the § 8(a) claims raised a sufficiently different question from that heard by the grievance committee so that deference to the committee's decision did not bar consideration of the complaint. She also ruled that because the individual rights of an employee (as opposed to the group interests of the union) were at stake, it would be improper to require Hammontree to exhaust his grievance remedies. Upon review, the Board affirmed the first and reversed the second of these holdings. The Board held that under its policy set forth in *United Technologies Corp.*, 268 N.L.R.B. 557 (1984), Hammontree was required to exhaust the grievance procedures established by the CBA. *Consolidated Freight-*

---

2. Article 6 of the CBA provides, in relevant part:
   The Employer agrees, subject to the following provisions, that all conditions of employment in his individual operation relating to ... working conditions shall be maintained at not less than the highest standards in effect at the time of the signing of this Agreement....

3. Section 8(a) of the NLRA provides, in relevant part:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

   . . . . .

   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....
   29 U.S.C. § 158(a).

4. Article 8 of the CBA outlines grievance procedures and provides that "[a]ll grievances or

questions of interpretations [sic] arising under this ... Agreement ... shall be processed" according to those procedures.

5. Article 21 of the CBA provides, in relevant part:
   Any employee member of the Union acting in any official capacity whatsoever shall not be discriminated against for his acts as such officer ..., nor shall there be any discrimination against any employee because of Union membership or activities.
   Article 37 of the CBA provides, in relevant part:
   The Employer and the Union agree not to discriminate against any individual with respect to hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, sex, or national origin, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of race, color, religion, sex, or national origin or engage in any other discriminatory acts prohibited by law.

*ways Corp.*, 288 N.L.R.B. 1252 (1988). Hammontree seeks review of the Board's order.

## B. *The NLRB's "Deferral" Policies*

This case concerns one of the Board's two "deferral" policies, its so-called "pre-arbitral deferral" policy. Under this policy, the Board refers complaints filed by the General Counsel to arbitration procedures established in the governing CBA; in doing so, the Board *defers* or delays its consideration of the complaint. Under a separate, so-called "post-arbitral deferral" policy, not directly implicated in this case,[6] the Board shows limited *deference* to decisions made through grievance and arbitration processes pursuant to collective bargaining provisions.[7]

As this discussion suggests, the Board's two "deferral" policies operate in different ways and serve different purposes.[8] Pre-arbitral deferral (what we will, for clarity's sake, call *"deferment"*) resembles the exhaustion requirements often found in administrative regimes and the abstention doctrines employed by federal courts. Post-arbitral deferral (what we will call *"deference"*) resembles appellate judicial deference.

### 1. *The Board's Deferment Policy*

In *Collyer Insulated Wire,* 192 N.L.R.B. 837 (1971), the Board considered a § 8(a)(5)

claim arising out of an alleged unilateral change of working conditions by an employer. The Board ruled that it would require exhaustion of CBA-provided arbitration remedies before it considered a § 8(a)(5) claim, if certain conditions are met. Such deferment is appropriate, the Board ruled, if

(i) there is a long-standing bargaining relationship between the parties;

(ii) there is no enmity by the employer toward the employee's exercise of rights;

(iii) the employer manifests a willingness to arbitrate;

(iv) the CBA's arbitration clause covers the dispute at issue; and

(v) the contract and its meaning lie at the center of the dispute.

192 N.L.R.B. at 842; *see also Local Union No. 2188 v. NLRB,* 494 F.2d 1087, 1090–91 (D.C.Cir.) (affirming *Collyer* deferment), *cert. denied,* 419 U.S. 835, 95 S.Ct. 61, 42 L.Ed.2d 61 (1974).

The Board extended this deferment policy to § 8(a)(1) and § 8(a)(3) complaints in *National Radio Co.,* 198 N.L.R.B. 527 (1972). After a temporary contraction of the policy,[9] the Board reaffirmed the *National Radio* policy in its 1984 decision in *United Technologies Corp.,* 268 N.L.R.B. 557 (1984). In that case, the Board recognized that the alleged violations of § 8(a) were also "clearly cognizable under the broad grievance-arbitration provision of . . . the [CBA]," *id.* at 560, and ruled that

---

**6.** In this case, CF raised both deference and deferment issues before the ALJ. The Board affirmed the ALJ's deference decision, but ordered deferment of Hammontree's claim. It is this latter aspect of the Board's order that Hammontree now challenges.

**7.** The CBA in this case provides for multiple levels of grievance proceedings, but does not provide for final and binding arbitration by a neutral arbitrator. Nonetheless, in this court and others, "bipartite committee grievance resolution procedures and decisions have been upheld as equivalent to arbitration." *American Freight System, Inc. v. NLRB,* 722 F.2d 828, 830 n. 4 (D.C.Cir.1983) (collecting authorities). Therefore, references to "arbitration" in this opinion should be read to include grievance proceedings such as those at issue in this case.

**8.** Thus, "deferral policy" is an unfortunate misnomer. "Post-arbitral deferral" is not deferral

at all, but deference, a limitation on the scope of the Board's review of arbitration awards. More importantly, pre- and post-arbitral deferral differ substantially in justification and in practice.

**9.** *See General American Transportation Corp.,* 228 N.L.R.B. 808 (1977) (overruling *National Radio Co.*). As the dissent reminds us, *see* Diss. at 1513–1514, "it is axiomatic that an agency choosing to alter its regulatory course 'must supply a reasoned analysis indicating that its prior policies and standards are being deliberately changed, not casually ignored.'" *Action for Children's Television v. FCC,* 821 F.2d 741, 745 (D.C.Cir.1987) (citation omitted). Although the Board's deferment policy has evolved substantially over the past 20 years, the Board has, in *National Radio, General American Transportation,* and *United Technologies,* offered reasoned opinions explaining its revised policies.

"[w]here an employer and a union have voluntarily elected to create dispute resolution machinery ..., it is contrary to the basic principles of the Act for the Board to jump into the fray prior to an honest attempt by the parties to resolve their disputes through that machinery." *Id.* at 559.

## 2. The Board's Deference Policy

The critical NLRB decision involving the Board's policy of deference to arbitration awards is *Spielberg Manufacturing Co.,* 112 N.L.R.B. 1080 (1955). In *Spielberg,* the Board ruled that it would give deference to an arbitrator's resolution of an unfair labor practice claim if certain conditions are met. As refined in subsequent cases, the Board's policy is to defer if:

(i) the ULP issue was presented to and considered by the arbitrator;

(ii) the arbitration proceedings were fair and regular;

(iii) the parties agreed to be bound by the arbitration award; and

(iv) the arbitration award was not clearly repugnant to the purposes and policies of the NLRA.

112 N.L.R.B. at 1082; *see also Raytheon Co.,* 140 N.L.R.B. 883 (1963). Although the policy has undergone several subsequent revisions, *see Darr v. NLRB,* 801 F.2d 1404, 1408 (D.C.Cir.1986) (discussing the "various twists and turns" of deference policy), *Spielberg* remains the seminal statement of the Board's deference policy.

## II. ANALYSIS

The central issue in this case, whether the Board may require an individual employee to exhaust grievance procedures prior to filing a ULP charge, is governed by the now-familiar two-step analysis set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* we first determine "whether Congress has directly spoken to the precise question at issue"; if it has, then "that

intention is the law and must be given effect." *Chevron,* 467 U.S. at 842–43 & n. 9, 104 S.Ct. at 2781–82 & n. 9. If the statute is "silent or ambiguous with respect to the specific issue," and if "the agency's answer is based on a permissible construction of the statute," we must defer. *Id.* at 843, 104 S.Ct. at 2782. Part A reviews the petitioner's *"Chevron I"* contentions that the NLRA and the LMRA affirmatively prohibit Board deferment in this case. Part B considers the petitioner's *"Chevron II"* arguments that the Board's decision was an impermissible exercise of its discretion and a departure from established Board policy.

## A. Chevron I *Analysis*

### 1. Section 10(a) of the NLRA

■ Section 10(a) of the NLRA provides that the Board's power to "prevent ... unfair labor practice[s]" "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise...." 29 U.S.C. § 160(a). Relying on his reading of the plain meaning and legislative history of § 10(a), Hammontree argues that this section prohibits Board deferment of his claim. We disagree and find that § 10(a) does not reflect any express congressional intention to preclude the Board's imposition of exhaustion requirements in cases such as Hammontree's.

Hammontree first contends that the plain language of § 10(a) prohibits Board deferment of his claim; he reads that section as providing that no one (not even the Board itself) may diminish the Board's authority to resolve and prevent ULPs in the first instance.[10] Although read literally and in isolation, § 10(a) might permit such an interpretation, a far more natural reading is that § 10(a) is an affirmative grant of authority to the Board, not an express limitation on the Board's authority. In other words, a more plausible reading of § 10(a) is that no one *other than* the Board shall

---

10. The petitioner's analysis is premised on the assumption that deferment of a ULP claim somehow "affect[s]" or diminishes the Board's authority. For purposes of *Chevron I* analysis, we adopt this premise *arguendo;* however, as we discuss below, *infra* Part II.B.1, this supposition may itself be faulty.

diminish the Board's authority over ULP claims.

This latter interpretation is supported by a contemporary congressional analysis which explained that the contested sentence "is intended to make it clear that although *other* agencies may be established by code, agreement, or law to handle labor disputes, such *other* agencies can never divest the National Labor Relations Board of jurisdiction which it would otherwise have." [11] Staff of Senate Comm. on Education and Labor, 74th Cong., 1st Sess., Comparison of S. 2926 (73d Congress) and S. 1958 (74th Congress) at 3 (Comm. Print 1935) (emphasis supplied) [hereinafter *"Comparison"*] *reprinted in* NLRB, 1 *Legislative History of the National Labor Relations Act* 1319, 1323 (1949) [hereinafter *"Leg.Hist. of the NLRS"*]. As that analysis indicates, Congress was concerned about other entities—such as states or industrial boards—infringing upon the Board's jurisdiction; Congress was not concerned about the Board itself deferring the exercise of its own jurisdiction. Thus, contrary to Hammontree's contention, § 10(a) is most logically read as an affirmative grant of power, firmly establishing the Board as the "Supreme Court of Labor." *Comparison* at 30, *reprinted in 1 Leg. Hist. of the NLRA* at 1357.

■ Hammontree also maintains that the legislative history of § 10 indicates Congress' express intention to preclude Board deferment. In particular, Hammontree relies on Congress' elimination of a provision (in earlier bills and earlier drafts

of the Act) which expressly stated that the "Board may, in its discretion, defer its exercise of jurisdiction over any such unfair labor practice in any case where there is another means of prevention provided for by agreement...." S. 1958, Original Senate Print, 74th Cong., 1st Sess. § 10(b) (1935); *reprinted in* 1 *Leg.Hist. of the NLRA* 1295, 1301. Citing hearing testimony that Board deferment authority would result in insufficient protection of individual employee rights, Hammontree argues that Congress, reacting to that testimony, eliminated the proposed language in order to preclude Board deferment.

An equally plausible reading of Congress' deletion of the proposed language, however, is that Congress deemed it superfluous in light of the sweeping language of § 10(a) itself. Again contemporary congressional analysis supports this interpretation of the legislative history, characterizing the deleted language as "carr[ying] out the same thought as the second sentence of § 10(a)" and as "carr[ying] out more explicitly the purpose to establish the Board as the paramount body in labor relations." *Comparison* at 3, 32, *reprinted in* 1 *Leg. Hist. of the NLRA* at 1323, 1358. In sum, there is strong evidence that Congress deleted the proposed section on grounds of redundancy. Certainly, we cannot say that the legislative history of § 10 reflects a specific congressional intention to foreclose Board deferment; at best, we can only say that Congress' intention in deleting the proposed section is ambiguous.

For these reasons, we must disagree with the petitioner's contention that § 10(a)

11. The analysis continued: "The motive for writing in this section can best be understood by referring to the President's letter to Mr. Biddle in regard to the case of *Jennings v. The San Francisco Call–Bulletin*." Staff of Senate Comm. on Education and Labor, 74th Cong., 1st Sess., Comparison of S. 2926 (73d Congress) and S. 1958 (74th Congress) at 3 (Comm.Print 1935) [hereinafter *"Comparison"*] *reprinted in* NLRB, 1 *Legislative History of the National Labor Relations Act* 1319, 1323 (1949). In *Jennings*, the charging party complained to the Board that he had been forced to resign because of his union activities. (Before the passage of the NLRA, the Board operated pursuant to an Executive Order.) The newspaper contended that a code established by the newspaper industry preclud-

ed Board jurisdiction. In a letter to Board Chairman Biddle, President Roosevelt " 'stepped in on the side of the newspapers' " and "denied the NLRB the authority to determine its own jurisdiction" in cases where such codes exist. J. Gross, 1 *The Making of the National Labor Relations Board* 119 (1974). Two Board members resigned in protest and the President later changed his mind. *Id.* at 120–21. This history clearly indicates that, in enacting the contested sentence, Congress was primarily concerned with the possibility that other entities—such as industrial boards—might preempt NLRB jurisdiction. Contrary to the dissent, Diss. at 1507, the second sentence of § 10(a), then, serves an express and significant purpose: it establishes the Board's preeminence in labor relations.

evidences a clear intent to preclude the Board from deferring consideration of a ULP claim until the claimant has exhausted grievance remedies under the CBA.

## 2. *Section 203(d) of the LMRA*

■ Hammontree also argues that the Board's deferment authority is limited by § 203(d) of the LMRA, which provides that "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes *arising over the application or interpretation* of an existing collective-bargaining agreement." 29 U.S.C. § 173(d) (emphasis supplied). Hammontree contends that his claim does not "arise over" the interpretation of the CBA and thus that deferment of his claim is not authorized by § 203(d)'s mandate.[12] We conclude, however, that Hammontree's claim falls squarely within the scope of § 203(d) and accordingly that that section in no way precludes the Board's deferment of Hammontree's claim.

Hammontree, as we have noted, contends that § 10(a) generally bars deferment, and interprets § 203(d) as authorizing deferment only in cases "arising over" interpretation of the CBA. He then goes on to argue that his discrimination claim under the NLRA does not "arise over" contract interpretation even though the CBA contains an anti-discrimination provision parallel to the section of the NLRA upon which his statutory claim is based.

Initially, we observe that § 203(d) reads most naturally as a general policy statement in favor of private dispute resolution, not as any kind of limitation on Board authority.[13] But even if we were to assume *arguendo* that § 203(d) does in some way limit the Board's deferment authority, Hammontree's argument fails on its own terms, for his § 8(a)(3) claim *does* "aris[e] over [contract] application or interpretation." Hammontree's discrimination claim, although raised under §§ 8(a)(1) and 8(a)(3), is also actionable under the contract. Article 21 of the CBA prohibits "discrimination against any employee because of Union membership or activities" and Article 37 of the CBA bars "discriminatory acts prohibited by law." These provisions led the Board to conclude that the alleged discrimination "is clearly prohibited by the contract." 288 N.L.R.B. at 1255.

■ Despite these contractual provisions, Hammontree contends that his "claim is simply one that arises under a statutory provision that happens to be parallel to a claim that could be advanced under the contract," and that therefore, his "claim does not rest upon a construction of

---

**12.** The dissent offers a similar argument, contending that Congress "carved out a limited preference" for private dispute resolution from the "unambiguous command of § 10(a)." Diss. at 1509. The dissent apparently believes that this court—rather than the Board—is the proper body to decide the precise "limits" of § 203(d), although *Chevron* would seem to dictate otherwise. The dissent does not appear to argue that § 203(d) is unambiguous in setting these limitations so as to require no interpretation. Indeed, it is by no means clear what the dissent itself believes to be the proper boundaries of the § 203(d) "exception": the dissent agrees that "[t]here are cases where" deferment is appropriate, Diss. at 1511, but suggests that the line should be drawn at *this* case. We believe that § 203(d) represents a quintessential delegation to the Board, not this court, to formulate a deferment policy that accommodates all of its varying statutory responsibilities.

**13.** In dissent, our colleague suggests that § 203(d) does not reflect a "generalized preference for private dispute resolution." Diss. at

1509. He seems to argue that, because the Conference Committee, in finalizing the LMRA, considered but rejected the idea of deleting the second sentence of § 10(a) (which provides that the Board's power "shall not be affected by any other means"), that sentence should be interpreted as limiting the Board's deferment authority recognized by § 203(d). We disagree. The legislative history of the LMRA indicates that the Conference Committee retained the second sentence of § 10(a) to eliminate any ambiguity created by the passage of § 301 of the LMRA which gave federal courts jurisdiction over certain claims against employers and unions. Contrary to the suggestion of the dissent the Conference Committee, in retaining the contested sentence, sought to make "clear that, when two remedies exist, one before the Board and one before the *courts,* the remedy before the Board shall be in addition to, and not in lieu of other remedies." H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. 52, *reprinted in* NLRB, 1 *Legislative History of the Labor Management Relations Act* (1948) at 556 (emphasis supplied).

the CBA." This can only be correct if the existence of parallel contractual and statutory provisions authorizes the complainant to choose one cause of action—either contractual or statutory—and nullify the other. But such an argument is founded on a misunderstanding of the relationship between the CBA and the Act. The fact that the CBA parallels the Act does not mean that Hammontree's claim arises only under *either* the Act *or* the CBA—the claim arises under *both*. *Cf. Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974) (stating that contractual rights and statutory rights under Title VII "have legally independent origins"). Contrary to Hammontree's implication, the CBA and the Act are *independent* sources of law governing the workplace.[14]

Hammontree cannot nullify his contractual claim simply by choosing to pursue his statutory claim. Such an interpretation of the law would severely undermine Congress' "decided preference for private settlement of labor disputes without the intervention of government" as reflected in § 203(d). *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 37, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). If a party could unilaterally release itself from a contractual pledge to submit complaints to arbitration simply because it had a parallel claim under the statute, then the pro-private dispute resolution policies

of § 203(d) would be substantially abrogated.[15]

Hammontree's complaint, therefore, clearly arises under Articles 21 and 37 of the CBA. As such, any limitations on the Board's deferment authority arguably created by § 203(d) do not affect Hammontree's claim, and § 203(d) does not preclude Board deferment of that claim.

### 3. *Section 10(m) of the NLRA*

█ Hammontree also argues that § 10(m) prohibits deferment of his claim, because that section requires that § 8(a)(3) and § 8(b)(2) discrimination claims be "given priority" over most other claims. Again, we find the petitioner's reading of the statute cramped; and we reject his contention that § 10(m) prohibits the Board from requiring the exhaustion of grievance remedies in § 8(a)(3) and § 8(b)(2) cases.

Section 10(m) of the NLRA provides, in relevant part, that

[w]henever it is charged that any person has engaged in an unfair labor practice within [§ 8(a)(3) or § 8(b)(2)[16]] ..., such charge shall be given priority over all other cases except cases of like character ... and cases given priority under [§ 10](*l*)....

29 U.S.C. § 160(m). Because the Board does not defer consideration of certain claims (such as § 8(a)(4) complaints[17]) not

**14.** As the Board noted in *Collyer* and reiterated in *United Technologies*, in such cases "'an asserted wrong is remediable in both a statutory and a contractual forum.'" *United Technologies*, 268 N.L.R.B. at 559 (citation omitted).

**15.** The dissent's suggestion that § 203(d)'s preference for private dispute resolution is only involved when "the [individual] employee has [ ] *voluntarily* submitted his [ ] claim to arbitration," Diss. at 1510 (emphasis supplied), is similarly infirm. To contend that Congress' "decided preference"—and a collectively bargained arbitration clause—can be automatically defeated at the option of an aggrieved employee is not only contrary to congressional intent, but also inconsistent with the fundamental tenet of labor law that a sound collective-bargaining agreement binds all employees. Moreover, as the Board noted, the dissent's view "would mean ... that a union could circumvent the contractual grievance procedure by the simple expedient of having the individual employee, instead

of the union, file the charge with the Board." *Consolidated Freightways Corp.*, 288 N.L.R.B. 1252, 1255 (1988).

**16.** Section 8(b)(2) provides that:
(b) It shall be an unfair labor practice for a labor organization or its agents—

.    .    .    .

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of [§ 8]a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated....
29 U.S.C. § 158(b)(2).

**17.** Section 8(a)(4) of the NLRA defines an unfair labor practice to include "discriminat[ion] against an employee because he has filed charges or given testimony under th[e] Act." 29 U.S.C. § 158(a)(4). The Board has maintained that § 8(a)(4) is "clearly required in order to

involving § 8(a)(3) and § 8(b)(2) discrimination, this section might be read to prohibit Board deferment of § 8(a)(3) and § 8(b)(2) claims. Thus, it could be argued that the Board can only defer Hammontree's § 8(a)(3) claim if it also defers all other claims (except those noted in § 10(*l*) [18]).

Section 10(m) does indeed direct that § 8(a)(3) and § 8(b)(2) discrimination claims shall be "given priority," but the meaning of that phrase is far from clear. Although "to give priority" could conceivably be interpreted as an imperative to the Board that it must hear and decide all § 8(a)(3) and § 8(b)(2) claims before it hears any other claims, that phrase can just as easily be understood as a direction to the Board that it ensure the most expeditious processing of § 8(a)(3) and § 8(b)(2) claims consistent with its expertise and other statutory responsibilities.

The Board's deferment policy is animated by this latter interpretation of § 10(m). Deferment, the Board reasonably argues, facilitates the expeditious processing of § 8(a)(3) and § 8(b)(2) claims by generally resolving complaints more quickly than Board proceedings could.[19] The dissent cries wolf when it claims that Hammontree's rights are "be[ing] sacrificed ... so the discrimination claims brought by others can be processed more easily." Diss. at 1511. The Board's treatment of Hammontree's claim is part of a systematic policy designed to accommodate its various statutory obligations pursuant to §§ 10(a), 203(d), and 10(m) and although *individual* claims may be left unresolved by arbitration so that deferment effectively delays the ultimate resolution of those claims, on the whole the policy of deferment expedites the resolution of the *class* of claims identified in § 10(m). Thus the Board's deferment policy is fully consistent with the priority mandate of § 10(m).

Given the realities of the Board's workload, an "imperative" interpretation of § 10(m) unrealistically restricts the Board's prerogative to regulate its own work. The NLRB processes more than 10,000 § 8(a)(3) and § 8(b)(2) claims every year[20]; requiring the Board to process and hear every one of these claims before it hears any other claim would postpone (perhaps indefinitely) the resolution of the thousands of claims not involving § 8(a)(3) and § 8(b)(2).[21] The legislative history of § 10(m) does not indicate that Congress intended to intervene so radically into the Board's processes and expert discretion. Introducing that section as a floor amendment to the Landrum–Griffin Act, Senator Mundt expressed concern for employees who "ha[d] been deprived of a job and a paycheck" because of discrimination; he noted that "these cases are [often] left hanging on the vine for a period, sometimes amounting to years." 2 NLRB, *Legislative History of the Labor–Management Reporting and Disclosure Act of 1959* at 1253 (1959) [hereinafter *"Leg.Hist. of the LMRDA "*]. This history indicates that Senator Mundt's purpose in introducing § 10(m) was to ensure the most expeditious resolution of § 8(a)(3) and § 8(b)(2) claims, not to preempt the Board's expertise in the management of its own proceedings.

---

safeguard the integrity of the Board's processes" and that "the duty to preserve the Board's processes from abuse ... may not be delegated ... to an arbitrator." *Filmation Associates, Inc.,* 227 N.L.R.B. 1721, 1721 (1977).

**18.** Section 10(*l*) creates a first-level priority for certain claims, including those involving secondary boycotts. *See* 29 U.S.C. § 160(*l*).

**19.** *See generally* F. Elkouri & E.A. Elkouri, *How Arbitration Works* 7–9 (4th ed. 1985).

**20.** *See* NLRB, *National Labor Relations Board Annual Report, FY 1988* at 189. The Board's

caseload was equally substantial during the period in which § 10(m) was debated. In 1960, the year after § 10(m) was enacted, the NLRB processed more than 11,000 claims, including more than 8,000 discrimination claims. *See* H.R.Rep. No. 95–637, 95th Cong., 1st Sess. at 26 (1977).

**21.** The dissent's interpretation of § 10(m) is not entirely coherent. The dissent decries the "delay" imposed by deferment and yet seems to call for the immediate consideration of more than 10,000 discrimination petitions—a result that would almost certainly cause even greater delay to many of these petitions than now prevails.

The Board's interpretation of § 10(m) is also to be favored because it is consistent with the Board's other statutory obligations, in particular those arising under § 203(d). It is difficult to reconcile § 203(d)'s express preference for *private* dispute resolution with an interpretation of § 10(m) as requiring that the *Board* itself hear all discrimination claims immediately. In contrast, interpreting § 10(m) to require that the Board implement a process it believes will ensure the most expeditious resolution of discrimination claims overall is wholly consistent with § 203(d). Established and familiar principles of statutory construction favor this latter interpretation of § 10(m), for courts are obligated to construe statutes harmoniously whenever possible. *See* Singer, *Sutherland Statutory Construction* § 53.01 (4th ed. 1984). For these reasons, we find that § 10(m) does not manifest a "clear congressional intent" to require immediate Board consideration of all discrimination claims. *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781–82 n. 9. Accordingly, we reject the petitioner's argument that § 10(m) precludes Board deferment of his discrimination claim.

In sum, the language and legislative history of §§ 10(a), 203(d), and 10(m) do not persuade us that Congress "has directly spoken to the precise question" of whether the Board may require an employee to exhaust grievance remedies before filing a ULP charge of discrimination. On that basis, we reject the petitioner's several *Chevron I* arguments.

### B. Chevron II *Analysis*

#### 1. *Limitations on the Board's Deferment Authority*

■ Hammontree argues under the second prong of *Chevron* that, even if Congress did not expressly limit the Board's deferment authority in the NLRA and the LMRA, its action in his case is based on an impermissible construction of the Board's authority under those statutes. Hammontree contends that Board deferment in

cases in which individual employee rights are at stake is inconsistent with a series of Supreme Court decisions beginning with *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). We find the alleged conflict illusory.

In *Alexander*, the Supreme Court held that Title VII creates individual statutory rights that supplement, rather than supplant, contractual rights under a CBA. Accordingly, the Court held that an employee's use of arbitration procedures did not bar a subsequent action, based on the same facts, brought in federal court under Title VII. The Court reached a similar conclusion in *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (considering an analogous claim brought under the Fair Labor Standards Act ("FLSA")) and in *McDonald v. West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (considering a first amendment claim brought under 42 U.S.C. § 1983). In each of these cases, the Court ruled that Congress (in Title VII, the FLSA, and § 1983) provided a public forum for individual-rights claims and that participation in private arbitration must not diminish one's right to such a forum. Hammontree reads these cases broadly, for the proposition that "individual statutory rights cannot be sacrificed on the altar of arbitration." Thus, Hammontree maintains that these cases limit the Board's discretion to defer claims in which an individual seeks to vindicate personal rights under the NLRA.

We disagree. In *Alexander, Barrentine*, and *McDonald*, the Supreme Court held that, when individual statutory rights are at stake, arbitration of a contractual claim does not preclude a subsequent statutory claim. In this case, however, we consider not the preclusive effect of arbitration awards but rather the Board's authority to require the exhaustion of arbitration remedies.[22] These issues are analytically

---

**22.** Thus, the dissent's reliance on *Alexander* is also inapt. Although the Supreme Court has noted that "consideration of [a ULP] claim by

[an] arbitrator ... does not preclude *subsequent* consideration by the NLRB as an unfair labor practice charge," Diss. at 1516 (emphasis sup-

distinct. To give an arbitration award preclusive effect would destroy an individual's right to a public forum for the protection of her statutory rights; Board deferment does not similarly nullify an employee's rights under the Act.[23] As the Board has stated:

> [D]eferral is not akin to abdication. It is merely the prudent exercise of restraint, a postponement of the use of the Board's processes to give the parties' own dispute resolution machinery a chance to succeed.

*United Technologies,* 268 N.L.R.B. at 560.[24] Deferment does not diminish Hammontree's right to a public forum; it merely delays it.[25]

Moreover, cases following *Alexander* and suggesting that an exhaustion requirement would be inconsistent with Title VII [26] are also not dispositive, for Title VII and the NLRA differ in several critical ways. First, under Title VII, Congress has expressly recognized that private dispute resolution and statutory relief are distinct and independent remedies; in contrast, under the NLRA, Congress has expressly legislated a preference for the use of private remedies, whenever feasible, before the resort to public remedies. Thus, in a decision suggesting that Title VII did not permit an exhaustion requirement,[27] the Supreme Court relied heavily on the fact that " 'Congress clearly has retained [private dispute resolution] as a remedy against private employment discrimination *separate from and independent of* the more elaborate and time-consuming procedures of Title VII.' " *International Union of Electrical, Radio & Machine Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 239, 97 S.Ct. 441, 448, 50 L.Ed.2d 427 (1976) (emphasis supplied) (citation omitted). But the same is not true of Congress' intent under the NLRA. In the NLRA, Congress clearly did not seek to segregate private dispute resolution as a remedy "separate from and independent of" statutory remedies. Indeed, § 203(d)'s express preference for private remedies reflects Congress' con-

plied) (citation omitted), at the risk of redundancy, we re-emphasize that such *"subsequent"* consideration is not at issue in this case.

**23.** A different question would be raised if the Board's deferment policy were grounded on a waiver theory, rather than on exhaustion grounds. *See generally* Edwards, *Deferral to Arbitration and Waiver of the Duty to Bargain: A Possible Way Out of Everlasting Confusion at the NLRB,* 46 Ohio St.L.J. 23 (1985). However, as we noted in *Darr,* "[s]ince the Board has not explicitly adopted that theory, it would be premature to express our view on the issue." 801 F.2d at 1409 n. 8.

**24.** *See also United Technologies,* 268 N.L.R.B. 560 n. 17: "Nothing in this decision diminishes the right of employees to seek statutory relief for alleged unfair labor practices."

**25.** Only if Hammontree had exhausted his arbitration remedies and filed a charge, and only if the Board had then deferred to the arbitration award in deciding his complaint, would we need to determine the applicability of *Alexander* to claims arising under the NLRA. Notwithstanding the passionate protests of our dissenting colleague, Diss. at 1516, that is not this case and we need not now make such a determination.

We do note, however, that the Supreme Court has indicated that employee rights under the FLSA and the NLRA may differ. *Compare Barrentine,* 450 U.S. at 740, 101 S.Ct. at 1444 (hold-

ing that a union cannot waive FLSA rights) *with Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 707–10, 103 S.Ct. 1467, 1476–78, 75 L.Ed.2d 387 (1983) (holding that a union may, under certain circumstances, waive members' NLRA rights). Whether any such differences exist in the area of post-arbitral deference is not now before us.

**26.** *See International Union of Electrical, Radio & Machine Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976); *see also Gibson v. Local 40,* 543 F.2d 1259, 1266 n. 14 (9th Cir.1976) ("Exhaustion of [arbitration remedies is] not a precondition to a Title VII suit."); *Waters v. Wisconsin Steel Works,* 502 F.2d 1309, 1316 (7th Cir.1974) (holding that "plaintiffs could properly proceed ... under section 1981 without first exhausting any contractual remedies"), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976); *but see Gilmer v. Interstate/Johnson Lane Corp.,* 895 F.2d 195 (4th Cir.) (holding that Age Discrimination in Employment Act does not preclude compulsory arbitration), *cert. granted,* —— U.S. ——, 111 S.Ct. 41, 112 L.Ed.2d 18 (1990).

**27.** In *Robbins & Myers,* the Supreme Court ruled that the statutory period for filing a Title VII claim would not be tolled during the pendency of arbitration proceedings. Given the filing period under Title VII, one consequence of this ruling is that an exhaustion requirement would render many Title VII claims time-barred.

sidered view that, with regard to NLRA rights, private and public dispute resolution were *not* independent, but interdependent.[28] Thus, although under Title VII an exhaustion requirement may be impermissible, § 203(d) expressly authorizes such a requirement in the redress of NLRA rights.

This distinction reflects broader conceptual differences between the remedial regimes created by Title VII and the NLRA. Title VII established nonwaivable individual rights, redressable in federal court; the NLRA established waivable[29] group and individual rights, redressable in a complex administrative scheme. In contrast to courts, which, under Title VII, are charged with adjudicating individual discrimination claims, the Board, under the NLRA, is charged with the overall administration of labor-management relations; accordingly, access to the Board in the first instance may be rationed differently, and exhaustion requirements in these two systems need not be identical. These differences indicate a basic flaw in applying the nonexhaustion aspect of Title VII jurisprudence to the NLRA, and lead us finally to conclude that the *Alexander* line of cases does not preclude the Board's deferment policy.

We, like the Board, recognize that in some circumstances justice deferred could be justice denied. As we emphasized in approving the Board's *Collyer* policy, deferment is a "balancing rule which requires deferral to arbitration only where a balance of ... policies favors deferral." *Local Union No. 2188*, 494 F.2d at 1090. Thus, if deferment posed "an undue financial burden upon one of the parties," or "prevent[ed] an orderly exposition of the law," or if "anti-union animus [indicated] that deferral ... would be a futile gesture," or if arbitration would render a subsequent statutory claim untimely,[30] then deferment might be impermissible. *See Local Union No. 2188*, 494 F.2d at 1091. As evidenced by the multi-factor analysis in its *Collyer* and *United Technologies* doctrines, the Board has also long recognized these limitations. However, in this case there is no indication that Board deferment taken along will prejudice Hammontree's right to a public forum should his claim be denied at grievance proceedings.

We also recognize that Board deferment may be impermissible if charges are filed by an individual employee and the interests of the charging party are so inimical to those of the union as to render arbitration an empty exercise.[31] Like our dissenting colleague, we are sensitive to the "possibility that [in some cases] the interests of the union may diverge from those of the employee." Diss. at 1516. Board abstention in such cases might indeed "constitute[ ] not deference, but abdication." *Local Union No. 2188*, 494 F.2d at 1091. Thus, the Board only defers if it holds a " 'reasonable

---

**28.** In *Johnson v. Railway Express Agency*, 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975), relied on heavily in *Robbins & Myers*, the Court held that the filing of a Title VII charge did not toll the statute of limitations for filing a § 1981 action; the court stated:

> We are disinclined, in the face of congressional emphasis upon the existence and independence of the two remedies, to infer any positive preference for one over the other, without a more definite expression in the legislation Congress has enacted....
>
> We generally conclude, therefore, that the remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends are separate, distinct, and independent.

As discussed above, we believe that § 203(d) expresses a "positive preference" for private dispute resolution.

**29.** For a discussion of the conditions and scope of waivers under the NLRA, see *Metropolitan Edison*, 460 U.S. at 707–10, 103 S.Ct. at 1476–78.

**30.** *Cf. Robbins & Myers*, 429 U.S. 236–40, 97 S.Ct. at 446–49 (holding that filing of a grievance does not toll the statute of limitations for a Title VII action); *accord* Diss. at 1516.

**31.** Congress has frequently recognized that the rights of individual employees are often threatened not only by employers but also by unions—whether because of union corruption, "company dominated unions," "sweetheart deals," or other arrangements. *See, e.g.*, 79 Cong.Rec. 7570 (1935) (remarks of Sen. Wagner), *reprinted in* NLRB, 2 *Legislative History of the National Labor Relations Act* at 2333–34 (1949); 105 Cong.Rec. 1430 (remarks of Rep. Bosch) (1959), *reprinted in* 2 NLRB, *Legislative*

belief that arbitration procedures would resolve the dispute'" and has "'refused to defer where the interests of the union ... are adverse to those of the employee.'" *United Technologies*, 268 N.L.R.B. at 560 (citation omitted); *see also* NLRB General Counsel, Guideline Memorandum Concerning *United Technologies Corporation* (March 6, 1984), *reprinted in* 1984 *Lab. Rel.Y.B.* 344. In this case, however, the record contains no suggestion of such hostility between the union and Hammontree and, as a result, the grievance procedures offer some hope of resolving Hammontree's discrimination claim.[32]

More broadly, we find that the Board's policy of deferment represents a reasonable construction of the Board's statutory duties and authority under the NLRA and the LMRA.[33] Courts have long recognized a "principle of deference" in reviewing agency actions "'involv[ing] reconciling [potentially] conflicting policies.'" *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782 (citations omitted). In this case, as discussed above, Congress has established the Board as "the paramount body" in labor relations law in § 10(a), called for the expeditious resolution of discrimination claims in § 10(m), and expressed its "decided preference for private settlement of labor disputes" in § 203(d). As the NLRB itself has observed, it is the Board's "'duty to serve the objectives of Congress [by seek-

ing] a rational accommodation'" among these policies. *United Technologies*, 268 N.L.R.B. at 559 (quoting *National Radio*, 198 N.L.R.B. at 531). The Board's deferment policy simultaneously recognizes the need for the prompt resolution of ULP claims, the importance of individual statutory rights, the limitations on Board resources, and the salutary effects of arbitration and minimal governmental intervention in labor disputes. Accordingly, the Board's deferment policy constitutes a reasonable accommodation of its multiple statutory obligations.

For these reasons, we find that the Supreme Court's decisions in *Alexander* and its progeny are not controlling and that the Board's deferment policy constitutes a permissible and reasonable construction of the NLRA and the LMRA.

2. *Consistency in Board Policy*

■ Finally, Hammontree contends that, in ordering exhaustion of grievance remedies, the Board has departed from its established policies.[34] Hammontree emphasizes that he has already pursued two related grievances and that the Board has never before required a *return* to arbitration. But this is a distinction without a difference. The fact that the union failed to raise during the grievance proceedings a

---

*History of the Labor–Management Reporting and Disclosure Act of 1959* at 1616 (1959).

**32.** There is absolutely no evidence in the record to support the dissent's assertion that the dispute-resolution mechanism in this case is "a sham grievance proceeding," Diss. at 1515, or a meaningless "drumhead proceeding," *id.* at 1516. Empirically, it seems most unlikely for, as noted above, Hammontree's first grievance was, in fact, *successfully* resolved in his favor.

**33.** The dissent's contention that *United Technologies* deferment is impermissible under *Chevron II* is unconvincing. The dissent maintains (1) that "no court has ever sanctioned" *United Technologies* deferment, Diss. at 1512; (2) that deferment constitutes abdication, Diss. at 1512–1513; and (3) that "Congress did not intend" such deferment, Diss. at 1513; thereupon, the dissent concludes, "Board deferral was inappropriate." Diss. at 1513. The first of these claims is irrelevant to our analysis under *Chevron II;* the second is simply not true, *see supra* pp. 1496–1498. With regard to the third, we emphasize that

Congress has expressed multiple intentions and issued numerous mandates to the Board, which, as the dissent recognizes, are in substantial tension. Given these manifold objectives and duties, this court's role is limited to assessing whether the Board's policy constitutes a reasonable accommodation among these demands.

**34.** In support of this argument, the petitioner cites a number of cases, exemplified by *Hilton Hotels Corp.*, 287 N.L.R.B. 562 (1987), and *M & G Convoy, Inc.*, 287 N.L.R.B. 1140 (1988). In each of these cases, the Board refused to give deference to arbitration awards because the arbitrator had not adequately considered the ULP claim (because, for example, the contractual and ULP issues were not factually parallel). These cases, however, involve only the Board's post-arbitral deference policy under *Spielberg* and its progeny; in none of these cases does the Board address the question presented in this case: whether, assuming that deference is inappropriate, *deferment* and a return to arbitration may be appropriate. Thus, the cases cited by

particular argument (the § 8(a)(3) discrimination claim) should not defeat the Board's deferment policy; if the deferment prerequisites are met and an issue is suitable for arbitration, the Board may require arbitration. And as the foregoing discussion suggests, Hammontree's claim fits squarely within the Board's established deferment policy under *Collyer* and *United Technologies.* Thus, we reject Hammontree's contention that the Board's order was anything more than an unexceptional application of its established deferment policy.

## III. CONCLUSION

In summary, we find that the NLRA and the LMRA do not preclude the Board from requiring a claimant to exhaust contractual grievance remedies before the Board hears a § 8(a)(3) discrimination claim. We also find that the Board's deferment policy is reasonable and is informed by a permissible construction of the Board's various statutory obligations, and that the Board's order in this case was wholly consistent with that policy. Accordingly, we deny the petition for review.

EDWARDS, Circuit Judge, concurring.

I do not view the issue posed in this case as raising a difficult question. Indeed, in light of well established legal precedent (including the case law commanding deference to the judgment of the Board on the issue at hand), I think that no serious challenge can be raised to the Board's policy of deferment with respect to arbitral issues. I write separately, however, to indicate why, in my view, this is not a difficult issue, and also to underscore certain points that I believe to be critical to our disposition of this case.

## I.

I agree with the majority that the Supreme Court's decisions in *Alexander, Bar-*

the plaintiff are not contrary to the Board's order in this case.

1. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (involving Title VII of the Civil Rights Act of 1964); *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641

*rentine* and *McDonald,*[1] denying deference or preclusive effect to arbitral awards, do not control the disposition of this case. I reject any suggestion, however, that this conclusion rests on any perceived distinction between the post-arbitral deference question raised in those cases and the pre-arbitral deferment issue which we now address. A close look at *Alexander, Barrentine* and *McDonald,* and their progeny, reveals that the logic driving the Court's holdings in those cases would also preclude an exhaustion of remedies or deferment requirement for the statutes involved.

The Court in *Alexander, Barrentine* and *McDonald* emphasized that Congress, in enacting Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (1988) ("Title VII"), the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* (1988) ("FLSA"), and section 1 of the Civil Rights Act of 1871, now codified as 42 U.S.C. § 1983 (1988) ("section 1983"), created individual rights and remedies *independent* of any employee contractual rights and remedies. *See, e.g., Alexander,* 415 U.S. at 54, 94 S.Ct. at 1022 (an employee filing a lawsuit under Title VII "is asserting a statutory right independent of the arbitration process"); *Barrentine,* 450 U.S. at 745, 101 S.Ct. at 1447 ("FLSA rights ... are independent of the collective-bargaining process.") Thus, in *Alexander* the Court noted that a Title VII plaintiff need not elect between arbitral and court fora because the statutory and contractual rights were "distinctly separate" and both rights could "be enforced in their respectively appropriate forums." 415 U.S. at 50, 94 S.Ct. at 1020. Similarly, in *Barrentine,* the Court's conclusion that the FLSA created rights independent of contractual rights was bolstered by the fact that the FLSA contained "[n]o exhaustion requirement." 450 U.S. at 740, 101 S.Ct. at 1444.[2] The Court's decisions in

(1981) (involving the Fair Labor Standards Act of 1938); *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (involving 42 U.S.C. § 1983).

2. In noting that not all labor disputes are suited for binding arbitration in accordance with collective-bargaining processes, the Court in *Bar-*

these cases effectively foreclose the possibility of deferment under either Title VII, the FLSA, or section 1983. Further support for this view can be found in *International Union of Electrical, Radio & Machine Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976). In *Robbins & Myers,* the Court effectively rejected any notion that an exhaustion of remedies requirement could exist under Title VII by holding that the statutory period for filing a Title VII claim would not be tolled during the pendency of arbitration proceedings. The Court found the argument for tolling "virtually foreclosed" by *Alexander,* since *Alexander* had clearly indicated that the contractual and statutory dispute resolution mechanisms were independent of one another. *Robbins & Myers,* 429 U.S. at 236, 97 S.Ct. at 446. Were there an exhaustion of remedies requirement under Title VII, the Court's holding in *Robbins & Myers* would have had the drastic effect of rendering many Title VII claims time-barred while still in arbitration, hardly a result which would preserve the independence of the two remedies.

The Court in *Robbins & Myers* also relied upon *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), which held that the filing of a Title VII claim does not toll the limitations period for a claim under 42 U.S.C. § 1981. Before reaching the tolling question in *Johnson,* the Court had held that a section 1981 claimant need not exhaust his Title VII remedies. The court stated that it was "disinclined, in the face of congressional emphasis upon the exist-

ence and *independence* of the two remedies," to express a preference for one by requiring its procedures to be exhausted before the other's procedures could be invoked. *Id.* at 461, 95 S.Ct. at 1720–21 (emphasis added).

Quite plainly, then, the Court has viewed an exhaustion requirement as simply inconsistent with the notion of distinct and independent remedies. I thus view *Johnson* and *Robbins & Myers* as having laid to rest any lingering doubts as to whether arbitration proceedings could be a prerequisite to Title VII and other such civil rights court actions.[3]

## II.

Although it seems clear that there can be no requirement of arbitral deferment under *Alexander* and its progeny, it is equally clear that the *Alexander* line of authority is easily distinguishable from the case at hand. The distinction rests on the fundamental differences between the National Labor Relations Act, as amended, 29 U.S.C. §§ 151–69 (1988) ("NLRA"), and the Labor Management Relations Act of 1947, as amended, 29 U.S.C. §§ 141–67, 171–87 (1988) ("LMRA"), and the statutes at issue in *Alexander, Barrentine, McDonald, et al.*

Under Title VII, the FLSA and section 1983, Congress emphasized that private dispute resolution mechanisms and statutory claims are separate and independent remedies; under the collective bargaining statutes, however, as manifested in section 203(d) of the LMRA, 29 U.S.C. § 173(d) (1988), Congress expressed a strong preference for the use of private remedies. And

*rentine* cited two cases finding no arbitral exhaustion requirement for asserting certain federal statutory rights. *Id.* 450 U.S. at 738 n. 12, 101 S.Ct. at 1443 n. 12 (citing *United States Bulk Carriers, Inc. v. Arguelles,* 400 U.S. 351, 357, 91 S.Ct. 409, 412, 27 L.Ed.2d 456 (1971) (employee need not exhaust contract remedies before (or in lieu of) asserting claim in federal court under statute regulating pay of maritime workers) and *McKinney v. Missouri–Kansas–Texas R.R.,* 357 U.S. 265, 268–270, 78 S.Ct. 1222, 1224–26, 2 L.Ed.2d 1305 (1958) (claimant need not pursue grievance and arbitration procedures before bringing federal claim under the Universal Military Training and Service Act).

3. Consistent with my understanding of the foregoing cases, lower federal courts have interpreted *Alexander* to mean that contractual remedies afforded by an applicable collective bargaining agreement need never be exhausted as a prerequisite to proceeding under statutes protecting public law rights. *See Gibson v. Local 40, Supercargoes & Checkers,* 543 F.2d 1259, 1266 n. 14 (9th Cir.1976) (relying upon *Alexander* in finding no exhaustion requirement under Title VII); *Waters v. Wisconsin Steel Works,* 502 F.2d 1309, 1316 (7th Cir.1974) (relying in part on *Alexander* in finding no exhaustion requirement under § 1981), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976).

while rights protected by Title VII, the FLSA and section 1983 are individual in nature, the NLRA and the LMRA are designed to protect both individual and collective rights, and have as their paramount goal the promotion of labor peace through the collective efforts of labor and management. Thus, while courts have the undivided responsibility to adjudicate claims of individual discrimination under Title VII and section 1983, the Board is charged with fostering the overall well-being of labor-management relations, which may be best accomplished by requiring the parties to seek to resolve their disputes through contractual dispute resolution mechanisms.

Most tellingly, in the *Alexander* line of cases, the Supreme Court has flatly rejected arguments suggesting that statutory rights may be waived by an agreement to arbitrate disputes arising under a collective bargaining agreement. See *Alexander*, 415 U.S. at 51, 94 S.Ct. at 1021 ("rights conferred [by Title VII] can form no part of the collective-bargaining process since waiver of those rights would defeat the paramount congressional purpose behind Title VII"); *Barrentine*, 450 U.S. at 740, 101 S.Ct. at 1444–45 (FLSA rights are "nonwaivable" and "cannot be abridged by contract"); *McDonald*, 466 U.S. at 292 n. 12, 104 S.Ct. at 1804 (relying upon *Alexander* and *Barrentine* in rejecting waiver argument with regard to § 1983 rights).

In stark contrast, the Court has explicitly recognized that, because a union represents collective interests, it may waive certain NLRA rights of its members. In *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983), the Court stated that it had long "recognized that a union may waive a member's statutorily protected rights. . . . Such waivers are valid because they rest on the premise of fair representation and presuppose that the selection of the bargaining representative remains free. . . . Thus a union may bargain away its members' economic rights, but it may not surrender rights that impair the employees' choice of their bargaining representative." *Id.* at 705–06, 103 S.Ct. at 1476 (quotation marks omitted). The Court rejected the argument

that only collective, as opposed to individual, NLRA rights are subject to union waiver, expressly distinguishing its holding in *Alexander* that a union cannot waive its employees' individual Title VII rights. The Court indicated that the possibility of waiver of statutory rights depends upon the "purposes of the statute at issue," and stated that, unlike Title VII, the NLRA "contemplates that individual rights may be waived by the union so long as the union does not breach its duty of good-faith representation." *Id.* at 706–07 n. 11, 103 S.Ct. at 1476 n. 11.

This court as well has acknowledged that a union may properly waive an employee's individual NLRA rights. In *Fournelle v. NLRB*, 670 F.2d 331, 335–36 (D.C.Cir.1982), we found that a no-strike provision in a collective bargaining agreement waived an employee's right to participate in or encourage strike activities. And in *American Freight System, Inc. v. NLRB*, 722 F.2d 828 (D.C.Cir.1983), we held that where a provision in a collective bargaining agreement relating to the refusal of work assignments differed from an analogous NLRA provision, the parties' agreement constituted a waiver of the employee's statutory rights. To have held that the statutory right survived the parties' contrary contractual agreement, we noted, would have been to embrace

> [t]he obvious fallacy . . . that there is a statutory issue apart from the contractual issue. . . . In other words, assuming, *arguendo*, that an individual employee has a right under the NLRA to refuse to work in order to pursue a contract claim that is not in fact "justified" but only supported by a "good faith" belief in wrongdoing, that alleged right was waived by the collective bargaining agreement in this case.

*Id.* at 832.

Likewise, in *Local Union No. 2188 v. NLRB*, 494 F.2d 1087 (D.C.Cir.), *cert. denied*, 419 U.S. 835, 95 S.Ct. 61, 42 L.Ed.2d 61 (1974), the court recognized that the availability of arbitration may effectively foreclose any access to Board remedies. On this point, the court acknowledged the

strong federal labor policy of encouraging private settlement of grievance disputes and found that "[i]t is well established that the Board may decline to take jurisdiction of a complaint if, in its judgment, Federal labor policy is best served by leaving the parties to voluntary settlements." *Id.* at 1090. The court then went on to observe that

> [w]e believe that this declaration of policy applies in the pre-arbitral ... context as well as in the post-award context. We also believe that this policy supports pre-arbitral deferral since the grievance and arbitration procedure is the only remedy left to a party from whom the Board withholds statutory relief.

*Id.*

Consistent with these cases, I believe that, in light of the parties' agreement prohibiting discrimination and requiring arbitration, Hammontree was properly required by the Board to arbitrate his grievance pursuant to the terms of the collective bargaining contract. The parties to the collective agreement chose to supplant statutory rights with analogous rights created under the contract, and they provided that disputes concerning those rights would be resolved pursuant to an agreed-upon grievance procedure. Giving legal effect to that agreement respects the private ordering of rights and responsibilities established through collective bargaining, and fosters the strong labor policy of promoting industrial peace through arbitration. Consequently, Board deferment in the case is clearly permissible.

Furthermore, even if it might be argued that there was no "clear and unmistakable"

waiver of statutory rights in this case, *see Metropolitan Edison*, 460 U.S. at 708, 103 S.Ct. at 1477, the Board could still require deferment. This is so because the Supreme Court has said in other contexts that, even when parties do not forgo substantive rights afforded by statute, they still may be required to adhere to an agreement to arbitrate a statutory claim. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 636–40, 105 S.Ct. 3346, 3358–61, 87 L.Ed.2d 444 (1985); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 229–34, 107 S.Ct. 2332, 2339–42, 96 L.Ed.2d 185 (1987). In such a situation, the parties simply submit the resolution of their dispute "in an arbitral, rather than a judicial, forum." *Mitsubishi*, 473 U.S. at 628, 105 S.Ct. at 3354. And, as the Court noted, "[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* Thus, absent a finding of the sort underlying *Alexander, i.e.*, that statutory and contractual rights are "distinctly separate" and that arbitration cannot adequately substitute for adjudication as a means of enforcing statutory rights, deferment is clearly appropriate.[4] If a union has the acknowledged power to "bargain away" its employees' "statutorily protected rights" under the NLRA, the Board can certainly decline to exercise its jurisdiction when the union takes the lesser step of simply agreeing to have its members' rights vindicated in an arbitral, rather than Board, forum. Accordingly, Board deferment in this case is hardly problematic.[5]

---

**4.** The Fourth Circuit has recently relied on *Mitsubishi* and *McMahon* in holding that the Age Discrimination in Employment Act ("ADEA") does not preclude compulsory arbitration. In *Gilmer v. Interstate/Johnson Lane Corp.*, 895 F.2d 195 (4th Cir.), *cert. granted*, — U.S. —, 111 S.Ct. 41, 112 L.Ed.2d 18 (1990), the court acknowledged that "an arbitration agreement is unenforceable only if Congress has evinced an intention to preclude waiver of the judicial forum for a particular statutory right, or if the agreement was procured by fraud or excessive economic power." *Id.* at 197. The Court then analyzed the structure and legislative history of the ADEA and concluded that Congress had not

expressed any intent to foreclose the parties from choosing to vindicate their rights through arbitration.

**5.** Although the *Mitsubishi/McMahon* rationale and contractual waiver theory lead to the same result in this case, *i.e.*, affirmance of the Board's decision to defer, the two approaches are analytically distinct. Under waiver theory, the contractual rights *supplant* the statutory rights, and thus the arbitrator's sole responsibility is to enforce the rights created by the contract. Under *Mitsubishi* and *McMahon*, statutory rights are still being enforced, only in an arbitral,

### III.

The majority properly limits its discussion to the deferment question before us today and declines to consider whether the Board could subsequently grant deference to the decision reached by the grievance committee. Our present holding, however, will not hang as a loose strand in labor jurisprudence; rather, it will quickly be woven into the fabric of labor law pursuant to which the NLRB regulates the exercise of its jurisdiction. Thus, I believe it is important to recognize some of the inevitable implications of our decision upon Hammontree's claim, and the claims of those who follow him.

The rationale behind our holding today, as well as the prior precedent of this court, indicate quite clearly that the Board may accord considerable deference to the decision reached by the grievance committee in the event that Hammontree pursues his contract remedies and then brings his claim once again before the Board. As the majority opinion notes, the Board has articulated a policy to defer to an arbitration or grievance award so long as: (i) the arbitration/grievance proceedings appear to have been fair and regular; (ii) all parties have agreed to be bound by the grievance or arbitration mechanism; (iii) the result is not clearly repugnant to the purposes and policies of the NLRA; and (iv) the arbitrator has adequately considered the unfair labor practice claim. *See Olin Corp.*, 268 N.L.R.B. 573, 573–74 (1984).[6] Consistent with this policy, the Board retained jurisdiction of Hammontree's claim for further consideration only upon a showing that either: a) the dispute had not been resolved or submitted to arbitration; or b) the grievance or arbitration procedures had not been fair and regular or had reached a result that is repugnant to the Act.

Since the Board does not grant *de novo* review to claims which have been considered in arbitration, the Board's decision to defer a claim to arbitration inevitably diminishes the claimant's ability to have the Board determine his claim. *See NLRB v. Pincus Brothers, Inc.–Maxwell*, 620 F.2d 367, 374 (3d Cir.1980) (under Board's deference policy, "an arbitral award could be sustained which is only arguably correct and which would be decided differently in a trial *de novo* "). This is no surprise, however, for we have long been aware of the practical consequences of the Board's deferment policy.

For example, more than fifteen years ago, in *Local Union No. 2188*, we heard a case in which the Board had deferred a claim to arbitration, retaining jurisdiction only to the same limited extent as it did in this case. *See* 494 F.2d at 1089. We recognized that the claimant, upon returning to the Board after exhaustion of his arbitral remedies, would not be entitled to *de novo* review, and that "the results of an arbitration will very likely be dispositive of the unfair labor practice issue." *Id.* at 1091. Nonetheless, we upheld the Board's pre-arbitral deferment policy, noting that section 203(d)'s policy in favor of private dispute resolution of labor conflicts "applies in the pre-arbitral ... context as well as in the post-award context." *Id.* at 1090. While conceding that "the fostering of ... [the Board's pre-arbitral deferment] policy may be detrimental to another policy, *viz.*: that expressed by the Congress in granting the Board power to remedy unfair labor practices," *id.*, we found it "well established that the Board may decline to take jurisdiction of a complaint if, in its judgment, Federal labor policy is best served by leaving the parties to voluntary settlements." *Id.*

---

rather than court, forum. As I indicate above, I believe that contractual waiver theory is the correct approach in this case, as it respects the freedom of the parties to replace *waivable* NLRA rights with rights negotiated through collective bargaining.

**6.** While this court has never directly ruled on the propriety of the Board's current *Olin* standard, *see Darr*, 801 F.2d 1404, 1409 (D.C.Cir.

1986) (remanding to Board for further explanation of *Olin* standard), it has affirmed various Board doctrines according considerable deference to arbitral awards. *See, e.g., Bakery, Confectionery and Tobacco Workers v. NLRB*, 730 F.2d 812, 814–16 (D.C.Cir.1984); *American Freight System*, 722 F.2d at 831–34; *Bloom v. NLRB*, 603 F.2d 1015, 1018–21 (D.C.Cir.1979).

It is true that in *Local Union No. 2188*, we noted that a "congruence between the contractual dispute and the overlying unfair labor practice charge" was a factor militating in favor of deferment, and that, without such an interrelationship, "the Board's abstention might have constituted not deference, but abdication." 494 F.2d at 1091. However, in this case we have found the requisite congruence between the contractual and statutory claims. The collective bargaining agreement prohibits precisely the type of discrimination Hammontree alleges in his statutory claim. As the majority opinion notes, "[t]he fact that the ... [collective-bargaining agreement] parallels the Act does not mean that Hammontree's claim arises only under *either* the Act *or* the ... [collective-bargaining agreement]—the claim arises under *both*." Hammontree cannot be allowed to nullify his contractual claim simply by pursuing a statutory claim. His allegations of discrimination state a claim under the contract as well as under the NLRA, and Congress has indicated its preference for private resolution of labor disputes. Consequently, the Board may properly defer Hammontree's claim to arbitration, notwithstanding that the arbitral award "may be dispositive of the unfair labor practice claim." *Local Union No. 2188*, 494 F.2d at 1091.

### IV.

As I stated at the outset, I believe this is an easy case. In the *Steelworkers Trilogy*,[7] the Supreme Court recognized contract grievance procedures as the fora of choice for most claims arising under collective-bargaining agreements. Consistent with this policy, the Court has enforced agreements to arbitrate under section 301 of the LMRA even where it might ultimately be determined that the claim involves a matter within the *exclusive* jurisdiction of the Board, *e.g.*, where a claim involves representational rights which presumably may not be waived by contractual agreement. *Carey v. Westinghouse Elec. Corp.*, 375

U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964). The alleged statutory rights involved in this case are, in contrast, non-representational rights of the sort that *Metropolitan Edison* suggests are subject to waiver pursuant to collective bargaining. Moreover, there is no doubt that Hammontree's discrimination claim presents a grievance that is cognizable under the collective-bargaining agreement. Thus, the national policy favoring arbitration of labor disputes, a policy embodied in section 203(d) of the LMRA and recognized on numerous occasions by the Supreme Court, is furthered by the Board's deferment policy, while Hammontree's right to seek redress for discrimination is preserved through the contractual grievance mechanism. In short, there is no merit to petitioner's challenge to the Board's rule requiring claimants to use available contract remedies before seeking redress under the NLRA. I therefore concur in the judgment of the court.

SILBERMAN, Circuit Judge, concurring:

Although I find Judge Edwards' logic unassailable, I join the majority opinion because the Board did not articulate (either in its opinion or its brief) Judge Edwards' position.

MIKVA, Chief Judge, dissenting:

Paul Hammontree works as a truck driver for Consolidated Freightways. The Teamsters Union is the bargaining representative for Consolidated's employees. Hammontree is a dissident member of the union, having disagreed with Teamster officials on numerous occasions. The Teamsters had an understanding with Consolidated whereby the union promised not to press any employee grievances based on certain seniority rights if Consolidated would post departure times for available trucking assignments called peddle runs. Hammontree nevertheless filed a grievance

---

7. *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

based on his seniority rights and won, but Consolidated then discontinued its practice of posting times and, after Hammontree unsuccessfully challenged that action at a second grievance proceeding, the company retaliated by assigning him several undesirable runs.

The court today tells Mr. Hammontree that he must take his complaints for alleged violations of his rights under the national labor laws to a grievance committee composed of members half from the union's hierarchy and half from the employer. (It is as if a new kid at school was told to try and work things out with the two bullies who beat him up rather than have the principal intervene and discipline the ruffians.) Inexplicably, the court repeatedly suggests that the "parties" consented to such arbitration in this case, when in fact the "party" most concerned with and affected by the unlawful discrimination against him never consented to such arbitration and instead expressly chose to pursue a complaint arising solely under the National Labor Relations Act.

While there may have been a time when Congress blithely equated the interests of employees and their unions, subsequent experience with union corruption and the ensuing passage of the Landrum–Griffin Act have erased any such simple dichotomy between "labor" and "management." As Senator Dirksen observed, when introducing the labor reform legislation in the 86th Congress that would culminate in passage of the Landrum–Griffin Act,

> [r]ecent developments in some areas of labor-management relations have been very disturbing. Some union officials have forgotten that the purpose for their existence is to represent employees in collective bargaining. Some unions and employers have been careless of their obligations not to use the tool of collective bargaining to promote the interests of management and unions, as such. They have disregarded the rights and interests of the individual worker.

105 CONG.REC. 1174 (1959). The court writes today as if all labor disputes concern only unions and employers—as if Landrum–Griffin had no purpose or effect.

The court reaches its result by finding equivocal some plain language of the statute, reading the legislative history in a most selective manner, and altogether ignoring the clear directive from subsequent Congresses to pay special and prompt attention to the rights of the individual employees. Brushing aside cogent explanations for the statute's enumerated procedures, the court gives deference to the National Labor Relation Board's clear abdication of its statutory obligations. Mr. Hammontree is consigned to a never-never land of partisan proceedings where his rights under the law may *never* be adjudicated before the Board. If he works long enough, and is persistent enough, the Board might someday review (without the benefit of any explanation or record) a decision of the grievance committee. The sponsors and champions of the Landrum–Griffin Act would be dismayed to see such short shrift made of their efforts to build statutory protections against this very kind of abuse.

I think my colleagues are wrong.

## DISCUSSION

This case involves the intersection of two congressional policies: preventing unfair labor practices and fostering the collective bargaining process. Because the collective bargaining agreement between the Teamsters Union and Consolidated contains two provisions forbidding unlawful company discrimination against employees for exercising union rights, the court holds that deferring Hammontree's discrimination charges to arbitration was proper. However, since Hammontree did not pursue his claims under the non-discrimination clauses in the contract, and never consented to arbitration of his statutory claims, this is a straightforward example of the Board abdicating its responsibility to protect rank-and-file workers from their own unions as well as their employers.

A. *Congressional Enactments*

1. The Wagner Act.

There can be no dispute that the Wagner Act gave the Board exclusive power to prevent unfair labor practices. Section 10(a) of the Act, 29 U.S.C. § 160(a) (1988), provides in pertinent part:

> The Board is empowered to prevent ... any person from engaging in any unfair labor practice (listed in Section 8) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise....

The court contends that the section merely "empowers" the Board and in no way constrains its discretion to defer disputes to private arbitration. If this is correct, it is hard to understand why the proviso in the second sentence was even necessary. In fact, a review of the Act's legislative history demonstrates an alternative motivation, namely a clear directive *not* to let private parties interfere with the Board's congressionally mandated function. Furthermore, contrary to the majority's suggestion, the legislative history of the Act and its subsequent amendments confirms that there is no generalized preference for arbitration that would trump an individual employee's right under § 10(a) to have the Board consider his discrimination charges.

In debating the Wagner Act, Congress considered but failed to pass several bills containing the very same deferral authority that the court today discovers. The original version of the bill, introduced by Senator Wagner in 1935, would have allowed the Board to "defer its exercise of jurisdiction over any such unfair labor practice in any case where there is another means of prevention provided for by agreement, code, law, or otherwise, which has not been utilized." S. 1958, § 10(b), original Senate print, 74th Cong., 1st Sess. (1935), *reprinted in* NLRB, LEGISLATIVE HISTORY OF THE NATIONAL LABOR RELATIONS ACT (1949), at 1301 (hereinafter "HISTORY OF THE WAGNER ACT"). The early version of the Senate bill also contained a general arbitration provision that would have let the Board directly arbitrate labor disputes or appoint "any person, agent, or agency to act as arbitrator." *Id.*, § 12, *reprinted in* HISTORY OF THE WAGNER ACT, at 1305–07.

These proposals were vigorously opposed by various labor groups and spokesmen. Several witnesses expressed fears that the Wagner Act would usher in a system of "compulsory arbitration." *See Hearing on S. 2926 Before the Senate Comm. on Edu. and Labor*, 73rd Cong., 2d Sess. 488 (1934) (hereinafter "*Hrgs. on S. 2926*") (statement of George H. Powers on behalf of the Steelworkers of Bethleham Steel Corp.), *reprinted in* HISTORY OF THE WAGNER ACT, at 522; *Hearings on S. 1958 Before the Senate Comm. on Edu. and Labor*, 74th Cong., 1st Sess. 811–15 (1935) (hereinafter "*Hrgs. on S. 1958*") (speech of Louis Weinstock, National Secretary of the AFL's Committee for Unemployment Insurance and Relief), *reprinted in* HISTORY OF THE WAGNER ACT, at 2197–2201. These commentators conveyed a clear distrust of arbitration. Noting that "workers have been betrayed" in the past, Mr. Powers argued that "[a]ny compulsory system of arbitration would automatically be in favor of the company." *Hrgs. on S. 2926*, at 488. Mr. Weinstock was even more strident in condemning the arbitration provisions:

> All of the boards' actions have been characterized by long delays designed to demoralize and destroy the fighting strength and spirit of the workers.... We maintain that the arbitration measures inherent in this bill are aimed at forcing Government control over the rights of the workers to defeat their interests.

*Hrgs. on S. 1958*, at 813–14. *See also Hrgs. on S. 1958*, at 716–17 (statement of William H. Davis of the Twentieth Century Fund, Inc.), *reprinted in* HISTORY OF THE WAGNER ACT, at 2102–03.

In hearings on a predecessor bill introduced the year before, E.P. Cush, the National President of the Steel and Metal Workers Industrial Union, summarized the employees' concern that deferral would permit collusion by companies and unions

to deprive the workers of their fundamental protections against unfair practices:

> [Senator Wagner] says, "We will amend the bill so that the board shall arbitrate only when both sides agree to submit to arbitration." What will this mean to the rank and file and the majority of the American working class? Who are the "both sides" to be recognized by this bill? ... [Every decision will swing] against the worker. The history of arbitration boards has recorded many bitter instances and experiences which prove this contention conclusively.... [Union] bureaucrats are always ready to submit to arbitration. It has been their slavish policy for years.

*Hrgs. on S. 2926*, at 492, *reprinted in* HISTORY OF THE WAGNER ACT, at 526. While the rhetoric is strong, Mr. Cush could have been talking about Paul Hammontree's complaint here.

After this strong opposition was voiced, the Senate Committee deleted the deferral and arbitration language from the version of the bill that subsequently became the Wagner Act. *See* S. 1958, second Senate print, *reprinted in* HISTORY OF THE WAGNER ACT, at 2291, 2295–97; 79 CONG.REC. 7651–52, *reprinted in* HISTORY OF THE WAGNER ACT, at 2351, 2354–55. "The committee does not believe that the Board should serve as an arbitration agency. Such work, like conciliation, might impair its standing as an interpreter of the law." S.REP. NO. 573, 74th Cong., 2d Sess. 8 (1935), *reprinted in* HISTORY OF THE WAGNER ACT, at 2307. The various versions of the bills pending before the House of Representatives also indicate that the sections providing for deferral and arbitration were considered and later deleted. *Compare* H.R. 6288, 74th Cong., 1st Sess., *reprinted in* HISTORY OF THE WAGNER ACT, at 2464, 2468–70, *with* H.R. 7978, 74th Cong., 1st Sess., *reprinted in* HISTORY OF THE WAGNER ACT, at 2863, 2867.

The court points to the fact that the Senate Committee Report never explicitly disclosed the reasons for the changes. But the result had clear antecedents: Congress made a conscious decision not to adopt language that would broadly allow deferral of claims to arbitration, in response to the concerns expressed by witnesses about the risk of collusion between unions and employers. Instead, Congress opted for the empowering language of § 10(a). Contrary to the court's emphasis on a passage suggesting that the specific arbitration language was deleted only because of a perceived redundancy, *see* Maj.Op. at 1492, the fact remains that the precise deferral authority the Board now seeks was spelled out in the House and Senate bills but subsequently deleted without any suggestion in the Senate Committee Report that the final language of § 10(a) already gave the Board that authority. The Court restores the very procedure that Congress deleted.

The court suggests that § 10(a) places no limits on the Board's authority to delegate or defer enforcement. If this is true, then several *specific* delegation or deferral provisions (*i.e.*, §§ 3(b), 10(a)–(c), (k), & 14(c)(1) of the Act) are superfluous since they would presumably be available under the sweeping deferral authority that the court discovers in § 10(a). The rewrite of the statutory scheme is glaring.

Even the Board's explanation for why Congress settled for the language in § 10(a), namely as a reaction to the excessive power then vested in quasi-private industrial boards, underscores the hazard of deferring to "bipartisan" committees that operate "in an atmosphere of conciliation and compromise that may be admirably suited to the settlement of wage and hour disputes" but are ill-suited to ensuring that all employees were protected against discrimination. *See* S.REP. NO. 573, at 4–5 (the Act must be "enforced ... rather than broken by compromise; and its enforcement must reside with governmental rather than quasi-private agencies"), *reprinted in* HISTORY OF THE WAGNER ACT, at 2304. As explained below, the Teamster Joint Grievance Committees operate in an identical, and equally objectionable, fashion. Even Senator Wagner recognized that "[t]he practical effect of letting each industry bargain and haggle about what section 7(a) means is that the weakest groups who need its basic protection most receive the least."

*Hrgs. on S. 1958,* at 50–51, *reprinted in* HISTORY OF THE WAGNER ACT, at 1426–27.

It is clear, then, that even before the Landrum–Griffin Act was passed in 1959, the substantive sections of the Wagner Act already demonstrated the centrality of safeguarding workers from unfair labor practices such as discrimination. Congress consistently expressed its desire to protect the individual worker against discrimination by his employer *or* his union. This was highlighted by the extensive congressional debates concerning the perils of the so-called "company-dominated union" that fails to protect the rights of workers. *See* 79 CONG.REC. 7570 (1935) (remarks of Sen. Wagner), *reprinted in* HISTORY OF THE WAGNER ACT, at 2333–34. While the majority-rule provision of the Wagner Act was designed to ensure that the union with the greatest employee support would be the exclusive bargaining representative for all employees, Congress maintained that the non-discrimination provisions of the Act would protect individual employees even without their union's help. *See* S.REP. NO. 573, at 13, *reprinted in* HISTORY OF THE WAGNER ACT, at 2312–13. As Senator Wagner stated during floor debates, "the prohibition of certain unfair labor practices ... [is] intended to make the worker a free man." 79 CONG.REC. 7574 (1935), *reprinted in* HISTORY OF THE WAGNER ACT, at 2343.

### 2. The Taft–Hartley Act.

The preference for arbitration of disputes involving the application or interpretation of a collective bargaining agreement was added by § 203(d) of the Labor–Management Relations ("Taft–Hartley") Act in 1947. After initially charging the Board with preventing unfair labor practices through the Wagner Act, Congress subsequently carved out a limited preference for allowing parties to a collective bargaining agreement to resolve any disputes over that agreement in a manner agreed upon by them. Accordingly, section 203(d) of the Act, 29 U.S.C. § 173(d), provides in pertinent part:

> Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement.

The majority contends that § 10(a) is ambiguous in light of this competing congressional directive to promote collective bargaining. Indeed, one of the concurring judges finds this an easy case because the "parties to the collective agreement chose to supplant statutory rights with analogous rights created under the contract...."

But this case does not require any application or interpretation of the collective bargaining agreement, and Hammontree never agreed to give up his statutory protections against discrimination by the very parties to the collective bargaining agreement. There is nothing that would dilute the unambiguous command of § 10(a). In fact, § 203(d) is not the generalized preference for private dispute resolution that the court suggests. The version of the Taft–Hartley Act that passed the House would have deleted the sentence of § 10(a) that limits the Board's ability to defer, but the Conference Committee retained the sentence in order to prevent private rights of action from supplanting existing remedies. *See* H.REP. NO. 510, 80th Cong., 1st Sess. 52 (1947), *reprinted in* NLRB, LEGISLATIVE HISTORY OF THE LABOR MANAGEMENT RELATIONS ACT (1948), at 556.

The potential for tension between these two policies has prompted numerous challenges to the Board's administration of the Act. *See, e.g., NLRB v. Strong,* 393 U.S. 357, 360, 89 S.Ct. 541, 544, 21 L.Ed.2d 546 (1969) ("[I]t has been made clear that in some circumstances the authority of the Board and the law of the contract are overlapping, concurrent regimes, neither preempting the other."); *Darr v. NLRB,* 801 F.2d 1404, 1409 (D.C.Cir.1986) (expressing doubts about Board deferral of statutory unfair labor practice claims in light of the tension between § 203(d) and § 10(a)). The Supreme Court just recently reemphasized, however, the narrow scope of § 203(d)'s preference for private dispute resolution. In *Groves v. Ring Screw Works,* — U.S. —, 111 S.Ct. 498, 112 L.Ed.2d 508 (1990), the Court held that the preference ex-

pressed in § 203(d) does not apply to contract provisions reserving non-peaceful methods of dispute resolution such as strikes.

The majority suggests that, since Hammontree's statutory claims *could* also have been brought under the parallel non-discrimination clauses in the collective bargaining agreement, these statutory claims necessarily involve the application or interpretation of the contract so as to trigger § 203(d)'s preference for arbitration. *See* Maj.Op. at 1493–1494. This argument is disingenuous. To borrow the abstention analogy used by the court to describe pre-arbitral deferral, Maj.Op. at 1490, the majority cannot mean to suggest that a federal court must abstain whenever a plaintiff could have invoked (but did not) parallel rights under state law. In holding that the Taft–Hartley Act only preempted state law if it required interpretation of a collective bargaining agreement, the Court recently noted that "there is nothing novel about recognizing that substantive rights in the labor relations context can exist without interpreting collective-bargaining agreements." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 411, 108 S.Ct. 1877, 1884, 100 L.Ed.2d 410 (1988).

The preference for arbitration is simply not involved in a case where the employee has not voluntarily submitted his discrimination claim to arbitration. The court's reasoning may well encourage the routine inclusion of contract provisions that merely incorporate the National Labor Relations Act by reference. If this does not wipe out the statutory rights guaranteed to rank-and-file workers, it certainly assures that their vindication will be substantially diminished and unnecessarily delayed. Hammontree has not "nullified" his rights under the collective bargaining agreement; he has consciously decided not to invoke them. The court's fear that unions might circumvent arbitration provisions by filing charges through individual employees, *see* Maj.Op. at 1494 n. 15, is unfounded (since the Board can police for good faith) and clearly not the situation here.

### 3. The Landrum–Griffin Act.

Perhaps nowhere is congressional concern for the well-being of the individual employee vis-a-vis the powerful union more manifest than in the Landrum–Griffin Act (the Labor–Management Reporting and Disclosure Act of 1959). The Act was passed at a time when union corruption was perceived to be widespread and individual employees were powerless to prevent abusive union tactics. In response, title I of Landrum–Griffin created a bill of rights for union members guaranteeing equal rights for all employees, including freedom of speech and the right to sue. *See* 29 U.S.C. § 411 (1988). It is clear from the legislative history of Landrum–Griffin that Congress no longer was willing to assume that the rights of individual employees would be adequately protected by the unions. Neither unions nor employers could be trusted to safeguard the interests of all their employees.

> In some few cases men who have risen to positions of power and responsibility within unions have abused their power and neglected their responsibilities.... The hearings of the McClellan committee have [also] shown that employers have often cooperated with and even aided crooks and racketeers in the labor movement at the expense of their own employees.

S.Rep. No. 187, 86th Cong., 1st Sess. 6 (1959), *reprinted in* NLRB, Legislative History of the Labor–Management Reporting and Disclosure Act (1959), at 402 (hereinafter "History of Landrum–Griffin"). Recounting the same concerns, the House Committee Report concluded that "it is essential that union practices and procedures be democratic and that they recognize and protect the basic rights of the union members and the employees represented by unions." H.Rep. No. 741, 86th Cong., 1st Sess. 7 (1959), *reprinted in* History of Landrum–Griffin, at 765.

Speaking in support of Landrum–Griffin, Congressman Bosch noted that most cases of discrimination brought before the Board are filed by individual employees, not unions. Many of such cases involved "so-

called sweetheart agreements between union leaders and employers and similar activities in which workers are denied their rights." 105 CONG.REC. 1430 (1959) (remarks of Rep. Bosch), *reprinted in* HISTORY OF LANDRUM-GRIFFIN, at 1616. As Congressman Bosch recognized, without government protection, an individual employee is powerless against his employer and union bosses. Thus, the Board's current policy of deferring individual unfair labor practice claims to grievance committees composed of company and union representatives interdicts its primary statutory responsibility to protect the rights of individual employees.

In addition to codifying the rights of union members and regulating the internal affairs of unions in order to stamp out racketeering and corruption, Landrum-Griffin also added § 10(m) to the National Labor Relations Act, providing that the Board should give discriminatory unfair labor practice claims arising under § 8(a)(3) priority over all other cases except secondary boycotts. *See* 29 U.S.C. § 160(m). According to Senator Mundt, who introduced this amendment, § 10(m) was intended to redress the problem of the individual employee who loses his job or wages as a result of discriminatory behavior; he explained that the Board often delays hearing such cases: "At present, a vast majority of these cases are left hanging on the vine for a period, sometimes amounting to years." 105 CONG.REC. 6044 (1959) (remarks of Sen. Mundt), *reprinted in* HISTORY OF LANDRUM-GRIFFIN, at 1253. By introducing this measure, Senator Mundt sought to extend to the individual the same priority treatment that the Board accorded companies faced with secondary boycotts. *See id.*

> The committee bill contains a provision which would ... require the National Labor Relations Board to give priority to cases involving discrimination.... Inasmuch as such discrimination cases often involve an employee's loss of his job, and consequently the livelihood of himself and his dependents, the committee believes such cases warrant priority treatment.

H.REP. No. 741, 86th Cong., 1st Sess. 27 (1959), *reprinted in* HISTORY OF LANDRUM-GRIFFIN, at 785. The Board's current policy of deferring individual discrimination cases to arbitration squarely conflicts with this congressional command that such cases be given priority treatment by the Board.

The court speculates that, by deferring as many § 8(a)(3) claims as possible, the Board is better able to expedite such claims in the aggregate. *See* Maj.Op. 1494–1496. I do not doubt that sweeping deferral of unfair labor practice claims will clear the Board's docket more expeditiously, just as I am sure the courts could do some docket clearing by deferring anytime the defendant wanted to go to an arbitrator of his or her choosing. But administrative efficiency was certainly not the goal expressed by Congress in § 10(m). Hammontree has an individual right to priority treatment by the Board that cannot be sacrificed just so the discrimination claims brought by others can be processed more easily. In fact, both the court today and the Board concede that deferral "delays" the consideration of an individual's statutory claim. *See* Maj.Op. at 1497. Section 10(m) does not permit such delay. Congress told the Board that discrimination claims should be "given priority," and the majority is wrong to read this as a vague delegation. It is in no sense an exercise of agency expertise to hope that as many claims as possible will simply go away without any effort by the Board. The circumstances of this delay, to an individual at odds with both his union and his employer, is particularly egregious.

### B. *Statutory Interpretation and Agency Practice*

The court has to overcome all of the plain language and legislative history hurdles described above to even reach the question of whether the Board's interpretation of the statute was reasonable and entitled to deference. In evaluating the Board's construction of these provisions, the court acknowledges that it is guided by the principles articulated in *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Under *Chevron*, we must first look

to the plain meaning of the Act. The majority is so preoccupied with the ambiguity it perceives in § 10(a) standing alone that it fails to adequately address the interplay of other provisions in the Act. "[I]n expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Dole v. United Steelworkers of America*, — U.S. —, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990) (internal quotes omitted); *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1368 (D.C.Cir.1990). When the language of § 10(a) is viewed in tandem with legislative intent and with other parts of the Act (especially in light of the Landrum–Griffin amendments), the statutory question can be settled under step one of *Chevron* rather than shunted into the lazy deference of step two. I believe that the Board violated Congress' clear intent when it deferred Hammontree's statutory claims. Even if we must proceed to step two, however, the court errs in ignoring *Chevron's* requirement that a court gauge the reasonableness of an agency's interpretation by looking at the statute as a whole.

There are cases where the tension created by the twin policies expressed in the Act can best be resolved by deferring to a grievance proceeding. This court has allowed the Board to defer unfair labor practice claims that require contract interpretation. *See Associated Press v. NLRB*, 492 F.2d 662 (D.C.Cir.1974); *Local Union No. 2188, IBEW v. NLRB*, 494 F.2d 1087 (D.C. Cir.), *cert. denied*, 419 U.S. 835, 95 S.Ct. 61, 42 L.Ed.2d 61 (1974). Likewise, other circuits have permitted the Board to defer where the *employee* has requested arbitration on the very issue before it, and the employee has not withdrawn that request. *See Lewis v. NLRB*, 800 F.2d 818 (8th Cir.1986). But until this case, no court has ever sanctioned deferral where the employee did *not* request arbitration and no portion of the claims rested upon a contractual matter. The Board's *own* preference for arbitration cannot implicate § 203(d)'s policy that encourages adjustment through procedures contained in collective bargaining agreements. We have never before

allowed the Board to defer *individual, non-contractual* unfair labor practice claims to arbitration.

The lead case establishing the Board's pre-arbitration deferral doctrine is *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971). In *Collyer*, the Board held that if the legal question of whether the employer has committed an unfair labor practice also determines whether the employer has violated the collective bargaining agreement, then it would send the case to arbitration and defer to the arbitrator's decision. The Board noted that allowing the union to bring such a claim before it would violate the union's commitment to arbitrate contractual disputes. *See* 192 N.L.R.B. at 842. The unfair labor practice issue was whether the company violated § 8(a)(5) of the Act by unilaterally altering the terms and conditions of employment when it changed the pay rates for certain job classifications. The Board recognized that adjudicating this statutory claim essentially required an interpretation and application of the terms of the collective bargaining agreement, a task within the special expertise of an arbitrator.

We expressly approved an application of the *Collyer* deferral rule in two cases where resolution of the unfair labor practice claim *required* interpretation of the collective bargaining agreement. *See Associated Press*, 492 F.2d at 666 (employer claimed that union's demand for dues collected pursuant to authorized "checkoffs" constituted an unfair labor practice); *Local Union No. 2188*, 494 F.2d at 1090–91 (union claimed that employer had unilaterally changed the promotion status of certain employees). In *Local Union No. 2188*, the court was careful to add, however, that if the "congruence between the contractual dispute and the overlying unfair labor charge ... were not present, the Board's abstention might have constituted not deference, but abdication." 494 F.2d at 1091. Abdication is precisely what the court condones in this case.

The Board announced an extension of the *Collyer* doctrine, after a series of shifts, in *United Technologies Corp.*, 268 N.L.R.B.

557 (1984). In *United Technologies,* the Board deferred to arbitration even though the unfair labor practice charge filed by the union was for unlawful coercion under § 8(a)(1) of the National Labor Relations Act and did not necessarily implicate any construction of the collective bargaining agreement. Deferral of such claims cannot be squared with the Board's mandatory obligation to remedy unfair labor practices, and I believe that *United Technologies* extended the *Collyer* principle beyond what this court had made clear in *Local Union No. 2188:* Congress did not intend to allow the Board to abstain in cases not involving any interpretation or application of a collective bargaining agreement. It should be pointed out that, in any event, the union in *United Technologies* had contractually agreed to an arbitration procedure.

Only one other court has considered the *United Technologies* doctrine, and its decision to affirm deferral in that case rested on the fact that "all parties had agreed to be bound." *See Lewis v. NLRB,* 800 F.2d 818, 821 (8th Cir.1986). In the *Lewis* case, the union had, with the employee's knowledge and consent, commenced the arbitration-grievance process prior to the filing of any unfair labor practice claim, and the demand for arbitration had not been withdrawn. The Eighth Circuit merely recognized that an employee may choose to raise a statutory claim in arbitration before proceeding to the Board, and may be bound by that choice. That choice belongs to the employee, not the union or the Board, and nothing in *Lewis* would authorize deferral under *United Technologies* when the *employee* has not consented to arbitration. *See also Wertheimer Stores Corp.,* 107 N.L.R.B. 1434, 1435 (1954) (refusing to recognize an arbitration award because the discharged employee had, from the outset, announced his desire to secure a hearing by the Board). The Administrative Law Judge in this case appreciated the difference as well: "an individual, as opposed to a labor organization, should not have to resort to the contractual grievance machinery for possible resolution of issues raised in an unfair labor practice charge." *Hammontree,* 288 N.L.R.B. at 1267. In this case, Hammontree did *not* agree to arbitration of his discrimination claims and those claims are wholly separate from any questions of contract interpretation. The union merely created an additional procedure whereby it could arbitrate statutory claims. Absent a conscious waiver by the employee of those statutory rights or a decision to effectuate those rights under the parallel non-discrimination provisions of the collective bargaining agreement, Board deferral was inappropriate.

Moreover, even at this late date, it is not clear that the Board has adopted and applied a consistent pre-arbitration deferral rule in cases such as Hammontree's. In *Cone Mills Corp.,* 298 N.L.R.B. No. 70, 134 L.R.R.M. 1105, 1109 n. 13 (1990), the Board reached the merits after this court remanded the initial deferral order in *Darr.* In *Hilton Hotels Corp.,* 287 N.L.R.B. 562, 563 (1987), where the unfair labor practice charge was brought upon the conclusion of arbitration on a related contract issue, the Board reached the merits after its initial deferral order was remanded in *Harberson v. NLRB,* 810 F.2d 977, 983–84 (10th Cir. 1987). In *NLRB v. U.S. Postal Service,* 906 F.2d 482, 488–90 (10th Cir.1990), the Tenth Circuit held that the Board did not abuse its discretion in declining to defer an unfair labor practice claim to arbitration. In an accompanying footnote, the court recounted the unfortunate history of the Board's pre-arbitration deferral policy, noting that it "has explicitly and dramatically changed its policy twice in the past thirteen years." *Id.* at n. 7.

Even after the Board decided this case, it premised a decision *not to defer* in another case on the same distinction between contractual and statutory interpretation involved here:

> In *Collyer* . . ., the Board found that the case was "eminently well suited to resolution by arbitration" because "[t]he contract and its meaning" were "at the center of [the] dispute." That is not the situation here, where the meaning of the contract does not constitute any part of the instant dispute. . . . [T]he defenses the Respondent raises to the unfair labor

practice allegations primarily revolve around the Act and its policies.... "The questions presented are therefore not ones of contract interpretation.... They are legal questions concerning the [Act] which are within the special competence of the Board rather than of an arbitrator."

*American Commercial Lines,* 296 N.L. R.B. No. 87, 133 L.R.R.M. 1100, 1102 n. 8 (1989) (citation omitted). The Board tries to distinguish this case by pointing out that it did not involve a parallel non-discrimination provision in the collective bargaining agreement but rather concerned interpretation of an informal settlement agreement. Even so, the Board's own explanation in *American Commercial Lines* (and recent practice of not deferring in such cases) would appear to buttress the distinction already evident in the statutory scheme.

Even if this case were otherwise appropriate for such deferral, a reviewing court should accord the Board's vacillating interpretations of the Act no particular deference. *See Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 492, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947) ("If we are obliged to depend upon administrative interpretation for light in finding the meaning of the statute, the inconsistency of the Board's decisions would leave us in the dark."). Although the court should be commended for trying to bring coherence to the Board's sometimes chaotic deferral practice (arguably a task that should be left to the Board on remand), the majority's resolution of the controversy in this case is at odds with the statutory scheme crafted by Congress over the years. While deferral may be warranted when an unfair labor practice claim requires the interpretation or application of the collective bargaining agreement, Congress did not contemplate such deferral when an individual employee brings a claim under the National Labor Relations Act that has nothing at all to do with the collective bargaining agreement.

## C. *The Waiver Doctrine*

No one disputes the fact that Hammontree's unfair labor practice charges properly arise under the substantive prohibitions contained in sections 7 and 8(a) of the Act, 29 U.S.C. §§ 157, 158(a)(1) & (3), although counsel for the Board now suggests that the inclusion of parallel non-discrimination provisions in the parties' collective bargaining agreement may have waived Hammontree's statutory right to be free from discrimination for engaging in protected activity. A waiver of an employee's statutory rights may not be found unless it is "established clearly and unmistakably." *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 708–09, 103 S.Ct. 1467, 1477–78, 75 L.Ed.2d 387 (1983) (Courts "will not infer from a general contractual provision that the parties intend to waive a statutorily protected right unless the undertaking is 'explicitly stated.' "). Nor does the arbitration provision by itself waive the statutory rights that might be settled in a grievance proceeding. *See id.* at 708 n. 12, 103 S.Ct. at 1477 n. 12; *Barton Brands,* 298 N.L.R.B. No. 139, 135 L.R.R.M. 1022, 1025–26 (1990) ("[A]n agreement to arbitrate a specific discharge, without more, does not meet the exacting standards we require of a waiver of an employee's statutory rights."). As this court has previously observed, "[a]n employee does not waive his statutory right to be free from unfair labor practices by virtue of his being a party to a collective bargaining agreement; he is entitled to a forum in which his complaint is fully and fairly aired." *Bloom v. NLRB,* 603 F.2d 1015, 1020 (D.C.Cir.1979).

The Board evidently takes a position that is more nuanced than an actual waiver theory, merely suggesting that it will only defer in cases where the statutory right at issue is waivable. A similar theory is proposed in Edwards, *Deferral to Arbitration and Waiver of the Duty to Bargain: A Possible Way Out of Everlasting Confusion at the NLRB,* 46 OHIO ST.L.J. 23 (1985). This distinction between waivable and non-waivable statutory rights, expressed for the first time by counsel at oral argument, appears nowhere in past Board deferral cases and was not made clear in the decision to defer Hammontree's charge. *See Darr v. NLRB,* 801 F.2d 1404, 1408 (D.C.Cir.1986) ("[T]he Board does not ex-

plicitly set forth a waiver theory or even consider whether a union can legitimately waive an individual employee's rights under Section 8(a)(1) and (3) of the Act, and if so whether the agreement in this case has in fact done so."). Although the court in *Darr* "reserve[d] the question whether a union can waive employees' NLRA protection against discrimination based on the employee's union activity in return for different collective bargaining rights," *id.* at 1408–09 n. 8, the same concerns about deferring an employee's retaliation charge to a sham grievance proceeding arise whether or not he could waive his § 8(a)(3) rights. The Board did not take the position that deferral was appropriate because Hammontree had or could have waived his statutory rights, and this would be an entirely different case had it done so. Indeed, if there was waiver, the Board would not even have the discretion not to defer, *see* Concurring Opinion at 1503, a dubious proposition in light of the clear command in § 10(a) that the Board's authority to prevent unfair labor practices cannot be affected by agreement.

The majority maintains that because Articles 21 and 37 in the collective bargaining agreement parallel the nondiscrimination guarantees in the Act, Hammontree's claims of retaliation can properly be submitted to arbitration. However, the fact that the union claims to have bolstered employees' protection against discrimination by negotiating the inclusion of these provisions in the contract would not deprive Hammontree of his preexisting statutory right to bring a claim under section 8(a)(1) and (3) before the Board. An individual's right to freely engage in union activities without fear of retaliation exists independently of any contract and cannot be diminished or diffused by its reiteration in a collective bargaining agreement. *Cf. Local 900, Internat'l Union of Elec., etc. v. NLRB,* 727 F.2d 1184, 1190 (D.C.Cir. 1984) (non-economic rights of employees under the Act are not waivable to the same extent as economic rights affecting union officials).

In analogous contexts, the Supreme Court has repeatedly made it clear that the statutory rights of individual employees to present their grievances before a public forum could not be denied by the existence of a private dispute resolution mechanism. In *Alexander v. Gardner–Denver,* 415 U.S. 36, 59–60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974), the Court rejected deference to arbitration of a discrimination claim under Title VII. A similar point was made in *Barrentine v. Arkansas–Best Freight System Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), discussing an employee's rights under the Fair Labor Standards Act.

> While courts should defer to an arbitral decision where the employee's claim is one that is based on rights arising out of a collective bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.

*Id.* at 737, 101 S.Ct. at 1443. Finally, in *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), the Court decided that an employee's First Amendment rights could not be left to arbitration so as to foreclose suit in federal court under 42 U.S.C. § 1983.

The majority distinguishes these decisions as based on other statutes, but the court thereby ignores the Supreme Court's clear teachings on the general question of deferring employees' claims to arbitration. "Although the analysis of the question under each statute is quite distinct, the theory running through these cases is" the same. *Atchison, Topeka & Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 565, 107 S.Ct. 1410, 1415, 94 L.Ed.2d 563 (1987). In *Alexander,* the Court noted that Congress had also contemplated access to both public and private forums for the resolution of charges under the National Labor Relations Act: "Where the statutory right underlying a particular claim may not be abridged by contractual agreement, the Court has recognized that consideration of the claim by the arbitrator as a contractual dispute under the collective-bargaining agreement does not preclude subsequent consideration

by the NLRB as an unfair labor practice charge." 415 U.S. at 50, 94 S.Ct. at 1020.

One of the reasons for not deferring to arbitration in these cases was the possibility that the union would not fully pursue an employee's statutory rights. In *Barrentine*, the Court recognized that the interests of rank-and-file employees may well diverge from the union. A union might legitimately sacrifice the individual claims of certain employees for what it believes is the greater good of the work force. *See* 450 U.S. at 742, 101 S.Ct. at 1445; *Vaca v. Sipes*, 386 U.S. 171, 190–91, 87 S.Ct. 903, 916–17, 17 L.Ed.2d 842 (1967). Certainly, the joint labor-management arbitration committees at issue here might well choose to address a particular employee's grievances through a generalized give-and-take of union/employee interests, instead of by conscientiously enforcing the terms of the statute. The majority fails to fully appreciate the possibility that the interests of the union may diverge from those of the employee. Indeed, Hammontree was at odds with his union's leadership; restricting him to a drumhead proceeding where his antagonists are viewed as his protectors frustrates the goals of the Act.

### D. *Exhaustion of Remedies*

The court contends that this is solely an exhaustion of remedies question and does not foreclose subsequent judicial review in case the grievance committee rejects Hammontree's unfair labor practice claim and the Board summarily affirms that decision. While that characterization may ease the court's conscience, it ignores reality. The Board's precedents amply suggest what will happen if Hammontree's grievance proceeding is ever concluded: it will no doubt defer yet again, according significant deference to the arbitrator's decision. A challenger to an arbitration decision bears the burden of showing that it was repugnant to the Act or that the statutory issues were not fairly decided. *See Olin Corp.*, 268 N.L.R.B. 573 (1984). An individual's right to have the Board review an arbitrator's decision under *Olin*'s highly deferential standard is fundamentally unlike the

right to *de novo* consideration of an unfair labor practice claim by the Board.

In cases such as this, where the risk of structural bias against an aggrieved employee is obvious, even careful review on appeal will not assure that the employee's statutory rights, including the priority expressed in § 10(m), are fully protected. Under the method used by the Teamster Joint Arbitration Committee, a "bi-partite" panel consisting of an equal number of union and employer representatives hears the employee's grievance. If the initial panel is deadlocked, the grievance proceeds to the next level, and so on up the line. There is no telling how much time will elapse before Hammontree has fully exhausted this private dispute resolution machinery and can once again appear before the Board if and when his discrimination charges are rejected. Such an arrangement fails to satisfy the requirements of diligence imposed on the Board by the Landrum–Griffin Act. Nor is it clear whether an employee who dutifully proceeds to arbitration from the outset loses his right to bring an unfair labor practice complaint before the Board under § 10(b) if the arbitration process takes more than a few months. While the Board will undoubtedly toll the running of the six month limitation period in Hammontree's case, and for others who first come to the Board before being sent back to arbitration, what happens to workers who wait for arbitration to conclude before pursuing their statutory rights before the Board?

There are other deficiencies in the Teamsters' grievance mechanism that may well hamper effective review after exhaustion. This is not arbitration in the traditional sense where parties submit their dispute to a neutral third party. After hearing the individual's claim, the joint committee meets in private and either grants or denies the claim without a word of explanation for its decision. Since no record is kept, there is simply no way of knowing that the individual's claim has been fairly decided, let alone the grounds for the curt decision. Such a scenario is particularly unacceptable if the individual employee is, as in this case, at odds with his union leadership.

"[T]he Teamster system does not adequately protect the individual from management or union discrimination. In effect, it mandates negotiation over whether the statute has been violated and places the alleged violators in the position of deciding the outcomes of the grievance." Comment, *The Teamster Joint Grievance Committee and the NLRB Deferral Policy: A Failure to Protect the Individual Employee's Statutory Rights*, 133 U.PA.L.REV. 1453, 1457 (1985). As there is no way to ensure that the employee will be adequately represented or that the arbitrator will properly interpret the governing statute, deferring an individual discrimination case to arbitration denies the employee the legal protection that he would receive if his case were heard *de novo* by the Board. *See also* Note, *The NLRB and Deference to Arbitration*, 77 YALE L.J. 1191, 1204–08 (1968).

The courts have never insisted upon exhaustion of remedies when the legal challenge implicates the very remedy itself. *See Association of National Advertisers v. FTC*, 627 F.2d 1151, 1156–57 (D.C.Cir. 1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980). In other contexts, we have made it clear that exhaustion is a prudential doctrine that should be applied flexibly and not when further pursuit of remedies is futile. *See Cutler v. Hayes*, 818 F.2d 879, 890–91 (D.C. Cir.1987). In previous situations where employees first lost at arbitration, courts have not insisted on strict adherence to a requirement that grievance procedures be exhausted before statutory proceedings may be initiated. *See Barrentine*, 450 U.S. at 738 n. 12, 101 S.Ct. at 1443 n. 12. Blind insistence on an exhaustion requirement may only mean that "the [employee] becomes exhausted, instead of the remedies." *NLRB v. Marine Workers Local 22*, 391 U.S. 418, 425, 88 S.Ct. 1717, 1722, 20 L.Ed.2d 706 (1968) ("There cannot be any justification to make the public processes wait until the union member exhausts internal procedures plainly inadequate to deal with all phases of the complex problem concerning employer, union, and employee member.").

In effect, the court's holding subjects Hammontree to compulsory arbitration, a regime that is anathema to the clear intent of Congress and contrary to this country's general disdain for such a system of dispute resolution. "Congress has expressly rejected compulsory arbitration as a means of resolving collective-bargaining disputes," *NLRB v. Amax Coal Co.*, 453 U.S. 322, 337, 101 S.Ct. 2789, 2798, 69 L.Ed.2d 672 (1981), and the Supreme Court has repeatedly emphasized that "[n]o obligation to arbitrate a labor dispute arises solely by operation of law." *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974) ("The law compels a party to submit his grievance to arbitration only if he has contracted to do so.").

> While the parties' freedom of contract is not absolute under the Act, allowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract.

*H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970). By forcing Hammontree to submit to an arbitration he never agreed to and never sought, the court effectively converts its obligations to protect his remedies under the law into a compulsory arbitration process where the arbitrators are his disputants.

The court concludes that the "Board's deferment policy simultaneously recognizes the need for prompt resolution of ULP claims, the importance of individual statutory rights, the limitations on Board resources, and the salutary effects of arbitration...." Maj.Op. at 1499. If only the Board's approach were so balanced and enlightened. Deferral to arbitration is perfectly legitimate when the issues submitted to the arbitrator require interpretation of a contract, or when the employee consents to arbitration of his unfair labor practice claim. However, when an unfair labor practice against an employee is involved,

and the employee brings the charge before the Board, we ought not allow Board deferral to a potentially hostile or indifferent agent for enforcement of the employee's statutory rights. Although the Board assures Mr. Hammontree that it retains ultimate jurisdiction to ensure that the result reached is not repugnant to the Act, the deferential standard of review makes it extremely unlikely that an arbitration decision will be overturned or thoroughly reviewed, to say nothing of the extensive delay that Congress specifically legislated against in the Landrum–Griffin Act. Indeed, under the Teamsters' grievance system, the goal of expediting employees' discrimination claims is turned on its head.

### Conclusion

The court today restructures the congressional scheme for protecting workers from unfair labor practices, telling the National Labor Relations Board that it may entrust the statutory rights of individual employees to a grievance system of most dubious dimensions. Congressmen Landrum, Griffin, Senator Dirksen and the other sponsors of the Landrum–Griffin Act would be saddened to know that their valiant efforts in the 86th Congress came to so little avail for Mr. Hammontree and similarly situated dissident union members.